## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,
THE SOUTHERN UTE INDIAN TRIBE,
THE STATE OF ALABAMA,
THE STATE OF COLORADO,
THE LOUISIANA DEPARTMENT
OF ENVIRONMENTAL QUALITY,
THE STATE OF WEST VIRGINIA, AND
THE STATE OF WYOMING,

       Plaintiffs,

   v.

THE WILLIAMS COMPANIES, INC.,
BARGATH LLC,
DISCOVERY PRODUCER SERVICES, LLC,
MID-CONTINENT FRACTIONATION
AND STORAGE, LLC,
UTICA EAST OHIO MIDSTREAM LLC,
WILLIAMS FIELD SERVICES
COMPANY, LLC,
WILLIAMS MOBILE BAY PRODUCER
SERVICES, LLC,
WILLIAMS OHIO VALLEY
MIDSTREAM LLC, AND
HARVEST FOUR CORNERS, LLC,

       Defendants.

Case No. _____

## **COMPLAINT**

Plaintiff the United States of America, by authority of the Attorney General of the United

States and through the undersigned attorneys, acting at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), and the Southern Ute Indian Tribe, the

State of Alabama, the State of Colorado, on behalf of the Colorado Department of Public Health

and Environment, the Louisiana Department of Environmental Quality, the State of West

Virginia, and the State of Wyoming (collectively, the "Plaintiffs") file this Complaint and allege as follows:

## STATEMENT OF THE CASE

1.      This is a civil action against defendants Williams Companies, Inc. ("Williams Companies"); Bargath LLC ("Bargath"); Discovery Producer Services, LLC; Mid-Continent Fractionation and Storage, LLC ("Mid-Continent"); Utica East Ohio Midstream LLC ("UEOM"); Williams Field Services Company; Williams Mobile Bay Production Services, LLC; Williams Ohio Valley Midstream LLC ("Williams OVM"); and Harvest Four Corners, LLC ("Harvest") (collectively, "Defendants")[1] pursuant to Sections 113(a)(3)(C) and 113(b) of the Clean Air Act (the "Act"), 42 U.S.C. § 7413(a)(3)(C) and 7413(b), in connection with unlawful air emissions from the Ignacio natural gas processing plant ("Ignacio Facility") on the Southern Ute Indian Reservation in La Plata County, Colorado; the Mobile Bay natural gas processing plant ("Mobile Bay Facility") in Coden, Alabama; the Parachute Creek natural gas processing plant ("Parachute Creek Facility") in Parachute, Colorado; the Willow Creek natural gas processing plant ("Willow Creek Facility") in Rifle, Colorado; the Conway Fractionator plant ("Conway Facility") in McPherson, Kansas; the Larose natural gas processing plant ("Larose Facility") in Lafourche Parish, Louisiana; the Paradis Fractionation plant ("Paradis Facility") in St. Charles Parish, Louisiana; the Harrison Hub Fractionation Plant ("Harrison Hub Facility") in Scio, Ohio; the Kensington natural gas processing plant ("Kensington Facility") in Kensington, Ohio; the

---

[1] For purposes of this Complaint, Defendants Bargath LLC, Discovery Producer Services, LLC; Mid-Continent Fractionation and Storage, LLC ("Mid-Continent"); Utica East Ohio Midstream LLC ("UEOM"); Williams Field Services Company; Williams Mobile Bay Production Services, LLC; and Williams Ohio Valley Midstream LLC ("Williams OVM") shall be collectively referenced as "the Williams Subsidiary Defendants." The term "Williams Defendants" shall be used to reference Williams Companies, Inc. and the Williams Subsidiary Defendants collectively.

Markham natural gas processing plant ("Markham Facility") near Markham, Texas; the Moundsville Fractionator plant ("Moundsville Facility") and the Oak Grove natural gas processing plant ("Oak Grove Facility"), both in Moundsville, West Virginia; the Fort Beeler gas processing plant ("Ft. Beeler Facility") in Cameron, West Virginia; the Echo Springs natural gas processing plant ("Echo Springs Facility") in Wamsutter, Wyoming; and the Opal natural gas processing plant ("Opal Facility") in Opal, Wyoming (collectively, the "Covered Facilities").

2.      Defendants' failure to comply with leak detection and repair ("LDAR") regulations and permit requirements has resulted in excess emissions of volatile organic compounds ("VOCs"), a precursor to ground-level ozone, often referred to as "smog." VOCs form ground-level ozone by reacting with sources of oxygen molecules, *e.g.*, nitrogen oxides and carbon monoxide, in the atmosphere in the presence of sunlight. Ground-level ozone is one of six criteria pollutants for which EPA has promulgated National Ambient Air Quality Standards ("NAAQS") due to its adverse effects on human health and the environment.

3.      In addition, some of the Covered Facilities, including at least the Echo Springs Facility, the Ignacio Facility, the Opal Facility, and the Parachute Creek Facility, emit benzene and other hazardous air pollutants ("HAPs") listed under Section 112(b) of the Act. 42 U.S.C. § 7412(b). Regulation of HAPs is separate from VOC regulation under the Clean Air Act because HAPs can cause cancer and other serious diseases.

4.      Plaintiff United States further alleges that Williams Defendants have violated and/or continue to violate 40 C.F.R. Part 60, Subparts A, Db, Kb, and NNN at various Covered Facilities, as more specifically alleged below.

5.      Plaintiffs seek injunctive relief and civil penalties for Defendants' violations of Sections 111 and 112 of the Act, 42 U.S.C. §§ 7411 and 7412, regulations promulgated under the

Act, and the Covered Facilities' permits issued pursuant to Title V of the Act, 42 U.S.C. §7661 *et seq*., the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§7470 *et seq*., and applicable provisions of state laws and the Southern Ute Indian Tribe/State of Colorado Environmental Commission's Reservation Air Code.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, 1355, and 1367.

7.    Venue is proper in this judicial district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b), 1391(c), and 1395(a), because a substantial part of the events or omissions giving rise to the violations that constitute the basis of this complaint occurred in this judicial district.

## AUTHORITY AND NOTICE

8.    The United States has authority to bring this action on behalf of the Administrator of the EPA under 28 U.S.C. §§ 516 and 519 and Section 305 of the Act, 42 U.S.C. § 7605.

9.    The Southern Ute Indian Tribe has authority to bring this action under the Southern Ute Indian Tribe/State of Colorado Environmental Commission's Reservation Air Code §§ 1-104, 1-105, 1-107, and 2-121 and Pub. L. No. 108-336, § 5, 118 Stat. 1354 – 1356 (2004).

10.    Alabama has authority to bring this action on behalf of the Alabama Department of Environmental Management (ADEM) under Ala. Code —§ 22-22A-5.

11.    Colorado has authority to bring this action on behalf of CDPHE under Colo.Rev.Stat. §§ 25-7-121 and -122.

12.    Authority to bring this action on behalf of the State of Louisiana is vested in LDEQ under La. R.S. 36:231 with the concurrence of the Attorney General of the State of Louisiana, at

the request of the Secretary of the LDEQ pursuant to La. R.S. 30:2025, La. R.S. 30:2050.7, and LAC 33:III.Chapter 5.

13.    West Virginia has authority to bring this action through the WVDEP under W. Va. Code § 22-5-6.

14.    The United States has provided notice of the commencement of this action to the States of Alabama, Colorado, Kansas, Louisiana, Ohio, Texas, West Virginia, and Wyoming, and to the Southern Ute Indian Tribe, as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## DEFENDANTS

15.    Williams Companies, Inc. is incorporated under the laws of the State of Delaware and has its principal place of business in Tulsa, Oklahoma.

16.    Williams Companies also owned the majority stake in Williams Partners, L.P., a limited partnership under the laws of the State of Delaware. In August 2018, Williams Companies acquired the outstanding shares of Williams Partners, L.P. and merged the company with a subsidiary of Williams Companies.

17.    Prior to October 2018, Williams Four Corners ("Williams FC") was organized in the State of Delaware, was authorized to do business in the State of Colorado, and was a wholly owned subsidiary of Williams Companies.

18.    Williams FC owned and operated the Ignacio Facility from at least 2006 through approximately October 1, 2018, when Harvest Midstream I, L.P. acquired one-hundred percent of Williams Field Services Group, LLC's equity interests in Williams FC and subsequently changed the name of the entity owning the Ignacio Facility from Williams FC to Harvest Four Corners, LLC. Harvest Four Corners, LLC is the current owner and operator of the Ignacio Facility.

19.     Williams Mobile Bay Production Services, LLC ("Williams MBPS") is the owner and operator of the Mobile Bay Facility. Williams MBPS is incorporated under the laws of the State of Delaware and has its principal place of business in Houston, Texas.

20.     Bargath LLC ("Bargath") is organized in the State of Delaware and authorized to do business in the State of Colorado. Bargath is a wholly owned subsidiary of Williams Companies. Bargath owns and operates the Parachute Creek Facility.

21.     Williams Field Services Company, LLC is organized in the State of Delaware and authorized to do business in the States of Colorado, Louisiana, Texas, and Wyoming. Williams Field Services Company, LLC is a wholly owned subsidiary of Williams Companies.

22.     Williams Field Services Company LLC owns and operates the Willow Creek Facility in Rio Blanco County, Colorado; the Markham Facility located near Markham in Matagorda County, Texas; the Echo Springs Facility in Echo Springs, Wyoming; and the Opal Facility in Opal, Wyoming.

23.     Williams Field Services Company, in partnership with Discovery Producer Services LLC, owns and operates the Larose Facility in Larose, Lafourche Parish, Louisiana and the Paradis Facility in Paradis, St. Charles Parish, Louisiana.

24.     Discovery Producer Services LLC is a limited liability corporation incorporated in the State of Delaware. Williams Companies has a majority interest in Discovery Producer Services LLC.

25.     Mid-Continent Fractionation and Storage, LLC ("Mid-Continent") is a limited liability company incorporated in the State of Delaware and has a principal place of business at One Williams Center, Tulsa, Oklahoma, 74172. Mid-Continent is a wholly owned subsidiary of

Williams Companies. Mid-Continent owns a 50% interest in the Conway Facility in McPherson, Kansas and is the facility operator.

26.     UEOM is a wholly owned subsidiary of Williams Companies. UEOM owns and operates the Harrison Hub Facility in Scion, Ohio, and the Kensington Facility in Kensington, Ohio. As of December 31, 2018, Williams Companies owned a 62 percent interest in UEOM. On March 18, 2019, Williams Companies acquired the remaining 38 percent interest in UEOM and obtained control of and consolidated UEOM.

27.     Williams Ohio Valley Midstream LLC ("Williams OVM") is a domestic limited liability corporation incorporated in the State of Texas and has a principal place of business at One Williams Center, Tulsa, Oklahoma 74172. Williams OVM is a wholly owned subsidiary of Williams Companies. Williams OVM owns and operates the Moundsville Facility in Moundsville, WV, the Oak Grove Facility in Moundsville, WV, and the Ft Beeler Facility in Cameron, WV.

28.     Harvest Four Corners, LLC ("Harvest") is incorporated in Delaware, has its principal place of business in Houston, Texas, and is authorized to do business in the State of Colorado.

29.     Defendants are each a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

30.     As set forth in Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1), the purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."

## A.      National Ambient Air Quality Standards for Ozone

31.      Section 108 of the Act, 42 U.S.C. § 7408, directs the Administrator of EPA to identify those air pollutants which "may reasonably be anticipated to endanger public health or welfare" and to issue air quality criteria for those pollutants based on "the latest scientific knowledge" about the effects of the pollutants on public health and the environment. The pollutants identified as such are called "criteria pollutants."

32.      Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing NAAQS for criteria pollutants. The primary NAAQS must be set at the level "requisite to protect the public health" with an adequate margin of safety, and the secondary standard is intended to protect "the public welfare." According to Section 302(h) of the Act, 42 U.S.C. § 7602(h), public welfare effects are "effects on soils, water, crops, vegetation" and other environmental impacts including, but not limited to, effects on animals, wildlife, property, and "effects on economic values."

33.      NAAQS are implemented within air quality control regions (or "areas") throughout individual states. An area with an ambient air concentration that meets the NAAQS for a particular pollutant is an "attainment" area. An area with ambient air concentrations that exceed the NAAQS is a "nonattainment" area, and an area that cannot be classified due to insufficient data is "unclassifiable."

34.      The potential adverse effects on human health of ozone pollution are well known. Epidemiological studies reviewed by EPA in setting the ozone NAAQS indicate that potential adverse effects on human health of short-term exposures to ground-level ozone include lung function diminution, respiratory symptoms, and pulmonary inflammation. 73 Fed. Reg. 16,436, 16445 (Mar. 27, 2008).

35.     The American Thoracic Society has noted that individuals uniquely at much higher risk for adverse health effects from ozone exposures include children, people with respiratory illness, the elderly, outdoor workers and healthy children and adults who exercise outdoors. *Id*. at 16462.

## B.     Prevention of Significant Deterioration Program

36.     Part C of Subchapter I of the CAA, Sections 161-169, 42 U.S.C. §§ 7471-7479, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as attainment or unclassifiable. These provisions are referred to herein as the "PSD program."

37.     The core of the PSD program is that "[n]o major emitting facility…may be constructed" or modified unless various requirements are met. 42 U.S.C. § 7475(a). These requirements include obtaining a permit with emission limits, demonstrating that emissions will not contribute to a NAAQS violation, and applying "best available control technology" ("BACT") to control emissions. *Id.*

38.     Section 169(1) of the Act, 42 U.S.C. § 7479(1), defines "major emitting facility" to include any source "with the potential to emit two hundred and fifty tons per year or more of any air pollutant."

39.     Section 169(2)(C) of the Act, 42 U.S.C. § 7479(2)(C), defines "construction" to include "modification" (as defined in Section 111(a) of the Act). "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

40.     Best available control technology means "an emissions limitation . . . based on the maximum degree of reduction for [the regulated] pollutant . . . which would be emitted from [the] major modification which the Administrator, . . . taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques . . . for control of such pollutant." 40 C.F.R. § 52.21(b)(12). It is a case-by-case determination made for each individual permit.

41.     The PSD permitting regulations for Indian country are found at 40 C.F.R. § 52.21.

**C.     Title V**

42.      Title V of the CAA, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources." The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA are collected in one permit.

43.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

44.     On July 1, 1996, EPA adopted regulations codified at 40 C.F.R. Part 71 setting forth the procedures and terms under which the Agency would administer a federal operating permits program. 61 Fed. Reg. 34202. These regulations were updated on February 19, 1999 to incorporate EPA's approach for issuing federal operating permits to stationary sources in Indian country. 64 Fed. Reg. 8247.

45.    In accordance with 40 C.F.R. §71.4(b), the EPA will administer and enforce an operating permits program in Indian country when a tribal agency has not developed its own operating permits program which meets the requirements of 40 C.F.R. Part 70.

46.    The EPA approved the Southern Ute Indian Tribe's Title V Operating Permit Program on March 2, 2012. 77 Fed. Reg. 15267 (March 15, 2012).

47.    Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the federal implementing regulations at 40 C.F.R. § 71.1(b), make it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

48.    Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), and the implementing regulations at 40 C.F.R. § 71.6(a), require that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with "applicable requirements" of the CAA.

49.    "Applicable requirement" is defined to include any relevant PSD requirements as well as any standard or requirement under Sections 111 or 112 of the Act. 40 C.F.R. § 70.2.

**D.    New Source Performance Standards ("NSPS")**

50.    Section 111(b) of the Clean Air Act authorizes the Administrator of the EPA to promulgate standards of performance applicable to "new sources" within categories of sources that cause "air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b).

51.    A "new source" under Section 111 is any stationary source, the construction or modification of which is commenced after the promulgation of the standards of performance which will be applicable to such source. 42 U.S.C. § 7411(a)(2).

52.     A "stationary source" is a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

53.     A "modification" is "any physical change in . . . a stationary source which increases the amount of any air pollutant emitted by such source." 42 U.S.C. § 7411(a)(4).

54.     In 1979, the EPA listed "Crude Oil and Natural Gas Production" as a source category that contributes significantly to air pollution and for which standards of performance would be established. 44 Fed. Reg. 49,222 (Aug. 21, 1979).

55.     Section 111(e) makes it unlawful for owners and operators of any new source to operate in violation of applicable standards of performance after they have gone into effect. 42 U.S.C. § 7411(e).

56.     The term "owner or operator" is defined as any person who owns, leases, operates, controls, or supervises a stationary source. 42 U.S.C. § 7411(a)(5).

### 1.     NSPS Subpart A

57.     EPA promulgated regulations that contain general provisions applicable to all NSPS sources in 40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 ("NSPS Subpart A").

58.     Under NSPS Subpart A, the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility." 40 C.F.R. § 60.1.

59.     For purposes of NSPS Subpart A, "affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

60.     NSPS Subpart A includes specific regulations that apply whenever flares are used as control devices. 40 C.F.R. §§ 60.18(b)–(f).

61.     The net heating value ("NHV") of the gas being combusted in a flare shall be calculated using an equation specified in 40 C.F.R. §60.18(f)(3).

**2.     *NSPS Subpart KKK***

62.     In 1985, based on the determination that emissions from crude oil and natural gas production cause or significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare, the EPA promulgated "Standards of Performance for Equipment Leaks of VOC from Onshore Natural Gas Processing Plants" under Section 111 of the Act, 42 U.S.C. § 7411.  50 Fed. Reg. 26,124 (June 24, 1985).

63.     Each of these standards is a "standard of performance" within the meaning of Section 111(a)(1) of the Clean Air Act, 42 U.S.C. § 7411(a)(1), or a "design, equipment, work practice, or operational standard, or combination thereof" under Section 111(h) of the Act, 42 U.S.C. § 7411(h). These standards are set forth in 40 C.F.R Part 60, Subpart KKK ("NSPS Subpart KKK"), which includes 40 C.F.R. §§ 60.630–36.

64.     NSPS Subpart KKK identifies "[t]he group of all equipment except compressors (defined in § 60.631) within a process unit" as an affected facility." 40 C.F.R. § 60.630(a)(3).

65.     NSPS Subpart KKK incorporates certain provisions of 40 C.F.R. Part 60, Subpart VV, by reference. *See* 40 C.F.R. §§ 60.632(a), 60.482-1(a), (b) and (d), and 60.482-2 through 60.482-10. These NSPS Subpart VV provisions require owners and operators of affected facilities to monitor equipment such as pumps and valves for leaks of air pollutants, repair leaks, and fulfill recordkeeping and reporting responsibilities.

66.     Owners or operators of natural gas processing plants subject to NSPS Subpart KKK must monitor equipment using "Method 21," a test method that entails, *inter alia*, using a calibrated

13

meter with a probe to carefully measure around equipment for leaks of VOCs or other regulated pollutants. 40 C.F.R. § 60.485.

67.     For purposes of NSPS Subpart KKK, a leak is detected from pumps and valves in natural gas processing plants if the detection instrument reading is 10,000 parts-per-million ("ppm") or greater. 40 C.F.R. §§ 60.632(a), 60.482-2 & 60.482-7.    When a leak is detected, it must be repaired as soon as practicable, but no later than fifteen (15) calendar days after the leak is detected in accordance with 40 C.F.R. § 60.482-7(d)(1).

### 3.     NSPS Subpart OOOO

68.     In 2012, the EPA promulgated under Section 111 of the Clean Air Act, 42 U.S.C. § 7411, "Standards of Performance for Crude Oil and Natural Gas Production, Transmission and Distribution." 77 Fed. Reg. 49,542 (Aug. 16, 2012).

69.     Each of these standards is a "standard of performance" within the meaning of Section 111(a)(1) of the Clean Air Act, 42 U.S.C. § 7411(a)(1), or a "design, equipment, work practice, or operational standard, or combination thereof" under Section 111(h) of the Act, 42 U.S.C. § 7411(h). These standards are set forth in 40 C.F.R Part 60, Subpart OOOO ("NSPS Subpart OOOO"), which includes 40 C.F.R. §§ 60.5360–5430.

70.     NSPS Subpart OOOO defines "process unit" as components assembled for the extraction of natural gas liquids from field gas, the fractionation of the liquids into natural gas products, or other operations associated with the processing of natural gas products. 40 C.F.R. § 60.5430.

71.     NSPS Subpart OOOO defines "equipment" as each pump, pressure relief device, open-ended valve or line, valve, and flange or other connector that is in VOC service or in wet gas service, and any device or system required by NSPS Subpart OOOO.  40 C.F.R. § 60.5430.

72.     NSPS Subpart OOOO applies to "affected facilities" for which owners or operators commence construction, modification, or reconstruction after August 23, 2011, and on or before September 18, 2015. 40 C.F.R. § 60.5365.

73.     NSPS Subpart OOOO identifies all equipment except compressors within a process unit at onshore natural gas processing plants as an "affected facility." 40 C.F.R. § 60.5365(f).

74.     NSPS Subpart OOOO defines "onshore" as all facilities except those that are located in the territorial seas or on the outer continental shelf. 40 C.F.R. § 60.5430.

75.     NSPS Subpart OOOO defines a "natural gas process plant" as any processing site engaged in the extraction of natural gas liquids from field gas, fractionation of mixed natural gas liquids to natural gas products, or both. 40 C.F.R. § 60.5430.

76.     Affected facilities are required to be in compliance with the standards of NSPS Subpart OOOO by October 15, 2012, or upon startup, whichever is later. 40 C.F.R. § 60.5370.

77.     NSPS Subpart OOOO identifies provisions of NSPS Subpart VVa that apply to owners and operators of affected facilities under NSPS Subpart OOOO.  40 C.F.R. § 60.5400(a).

78.     NSPS Subpart OOOO allows owners or operators of onshore natural gas process plants to comply with alternative requirements or "exceptions" for pressure relief devices in gas/vapor service. 40 C.F.R. § 60.5401(b).

79.     A "modification" that triggers the applicability of NSPS Subpart OOOO includes the addition or replacement of equipment for the purpose of process improvement which increases emissions, unless the equipment addition or replacement is accomplished without a "capital expenditure." 42 U.S.C. § 7411(a)(4), 40 C.F.R. §§ 60.2 and 60.5365(f)(1).

80.     NSPS Subpart OOOO includes requirements for monitoring equipment such as pumps, valves, and connectors for leaks of air pollutants, repairing leaks, recordkeeping, and

reporting to regulators. NSPS Subpart OOOO also incorporates certain other regulations in 40 C.F.R. Part 60 by reference, including certain provisions of NSPS Subpart VVa, 40 C.F.R. §§ 60.480a–489a.

81.   Owners or operators of natural gas processing plants subject to NSPS Subpart OOOO must comply with 40 C.F.R. § 60.485a, which requires owners and operators to use Method 21 in monitoring leaks from equipment. For purposes of NSPS Subpart OOOO, a leak is detected from pumps if the detection instrument reading is 2,000 ppm or greater, and from valves and connectors if the detection instrument reading is 500 ppm or greater. 40 C.F.R. §§ 60.482-2a, 60.482-7a, and 60.482-11a.

82.   NSPS Subpart OOOO allows owners or operators of onshore natural gas process plants to comply with alternative requirements or "exceptions" for pressure relief devices in gas/vapor service. 40 C.F.R. § 60.5401(b).

83.   Under NSPS Subpart OOOO's alternative requirements for pressure relief devices in gas/vapor service, leaking pressure relief devices must be repaired within at least fifteen calendar days after the leak is detected. 40 C.F.R. § 60.5401(b)(3)(i).

84.   For purposes of 40 C.F.R. § 60.5401, a leak is detected if the detection instrument reading is 500 ppm or greater. 40 C.F.R. § 60.5401(b)(2).

### 4.   NSPS Subpart OOOOa

85.   In 2016, EPA made amendments to NSPS Subpart OOOO. 81 Fed. Reg. 35,898 (June 3, 2016). Each of these standards is a "standard of performance" within the meaning of Section 111(a)(1) of the Clean Air Act, 42 U.S.C. § 7411(a)(1), or a "design, equipment, work practice, or operational standard, or combination thereof" under Section 111(h) of the Act, 42

U.S.C. § 7411(h). These standards were codified at 40 C.F.R. Part 60, Subpart OOOOa ("NSPS Subpart OOOOa"). 40 C.F.R. §§ 60.5360a-5430a.

86.     NSPS Subpart OOOOa defines "process unit" as components assembled for the extraction of natural gas liquids from field gas, the fractionation of the liquids into natural gas products, or other operations associated with the processing of natural gas products. 40 C.F.R. § 60.5430a.

87.     NSPS Subpart OOOOa defines "equipment" as each pump, pressure relief device, open-ended valve or line, valve, and flange or other connector that is in VOC service or in wet gas service, and any device or system required by NSPS Subpart OOOOa.  40 C.F.R. § 60.5430a.

88.     NSPS Subpart OOOOa applies to affected facilities for which owners or operators commence construction, modification, or reconstruction after September 18, 2015. 40 C.F.R. § 60.5365a.

89.     The group of all equipment within a process unit at an onshore natural gas processing plant is an affected facility. 40 C.F.R. § 60.5365a(f).

90.     NSPS Subpart OOOOa defines "onshore" as all facilities except those that are located in the territorial seas or on the outer continental shelf. 40 C.F.R. § 60.5430a.

91.     NSPS Subpart OOOOa defines "natural gas processing plant" as any processing site engaged in the extraction of natural gas liquids from field gas, fractionation of mixed natural gas liquids to natural gas products, or both. 40 C.F.R. § 5430a.

92.     NSPS Subpart OOOOa includes requirements for monitoring equipment such as pumps, valves, and connectors for leaks of air pollutants, repairing leaks, recordkeeping, and reporting to regulators. NSPS Subpart OOOOa also incorporates certain other regulations in 40

C.F.R. Part 60 by reference, including certain provisions of NSPS Subpart VVa, 40 C.F.R. §§
60.480a–489a.

93.     NSPS Subpart OOOOa requires owners or operators of an affected facility to
submit a notification as required by 40 C.F.R. § 60.7(a)(4). 40 C.F.R. § 60.5420a. The notification
is to be postmarked 60 days or as soon as practicable before a physical or operational change to an
existing facility which may increase the emission rate of any air pollutant to which the standard
applies, and must contain information of the precise nature of the change, present and proposed
emission control systems, productive capacity of the facility before and after the change, and the
expected completion date of the change. 40 C.F.R. § 60.7(a)(4).

94.     Equipment associated with a compressor station, dehydration unit, sweetening unit,
underground storage vessel, field gas gathering system, or liquefied natural gas unit is subject to
40 C.F.R. §§ 60.5400a, 60.5401a, 60.5402a, 60.5421a, and 60.5422a.

95.     Owners or operators of natural gas processing plants subject to NSPS Subpart
OOOOa must comply with 40 C.F.R. § 60.485a, which requires owners and operator to use
Method 21 in monitoring leaks from equipment. For purposes of NSPS Subpart OOOOa, a leak is
detected from pumps if the detection instrument reading is 2,000 ppm or greater, and from valves
and connectors if the detection instrument reading is 500 ppm or greater. 40 C.F.R. §§ 60.482-2a,
60.482-7a, and 60.482-11a.

96.     Owners or operators of natural gas processing plants subject to NSPS Subpart
OOOOa must comply with the requirements of 40 C.F.R. §§ 60.482-1a(a), (b), (d), and (e), 60.482-
2a, and 60.482-4a through 60.482-11a as soon as practicable but no later than 180 days after initial
startup of the process unit.

97.

### 5. *NSPS Subpart VVa*

98.    NSPS Subpart VVa of 40 C.F.R. Part 60, Subpart VVa, 40 C.F.R. §§ 60.480a – 60.489a [72 FR 64883, Nov. 16, 2007, as amended] ("NSPS Subpart VVa") applies to affected facilities in the synthetic organic chemicals manufacturing industry. 40 C.F.R. § 60.480a(a)(1).

99.    NSPS Subpart OOOO incorporates by reference, *inter alia*, Sections 60.482–1a(a), (b), and (d), Sections 60.482–2a and 60.482–4a through 60.482–11a, Section 60.485a, Section 60.486a, and Section 60.487a of NSPS Subpart VVa, except as provided in Sections 60.5401, 60.5421, 60.5422, and 60.5400(f) of NSPS Subpart OOOO.  40 C.F.R. § 60.5400(a), (d), and (e).

100.    NSPS Subpart OOOOa incorporates by reference, *inter alia,* Sections 60.482– 1a(a), (b), and (d), Sections 60.482–2a and 60.482–4a through 60.482–11a, Section 60.485a, Section 60.486a, and Section 60.487a of NSPS Subpart VVa, except as provided in Sections 60.5401a, 60.5421a, 60.5422a, and 60.5400a(f) of NSPS Subpart OOOOa.   40 C.F.R. §§ 60.5400a(a), (d), and (e).

101.    NSPS Subpart VVa sets forth general standards for owners and operators subject to NSPS Subpart VVa and, among other things, specifies at 40 C.F.R. § 60.482-1a(b) that methods of compliance determination include review of records and reports, review of performance test results, and inspection using the methods and procedures specified in 40 C.F.R. § 60.485a.  40 C.F.R. § 60.482-1a.

102.    NSPS Subpart VVa requires the owner and operator to monitor each pump monthly, with exceptions for pumps in vacuum or closed vent systems which do not apply to this case. 40 C.F.R. § 60.482-2a(a)(1).

103.    NSPS Subpart VVa requires that the owner and operator demonstrate compliance for all valves in gas/vapor or light liquid service within 180 days of startup. 40 C.F.R. § 60.482-1a(a).

104.    NSPS Subpart VVa requires owners and operators to monitor each valve in gas/vapor or light liquid service on a monthly basis to detect leaks until the valve does not leak for two successive months, at which point the valve may be monitored quarterly. 40 C.F.R. §§ 60.482-7a(a)(1) & 60.482-7a(c)(1)(i).

105.    NSPS Subpart VVa requires owners and operators make a first attempt at repair of a leaking valve in gas/vapor or light liquid service within five calendar days of the date the leak is detected. 40 C.F.R. § 60.482-7a(d)(2).

106.    NSPS Subpart VVa includes a requirement to repair a detected leak at a valve in gas/vapor or light liquid service within fifteen calendar days after the leak is detected. 40 C.F.R. § 60.482-7a(d)(1).

107.    NSPS Subpart VVa requires that, if a leak is detected at a valve, the valve shall be monitored monthly until a leak is not detected for two successive months. 40 C.F.R. § 60.482-7a(c)(2).

108.    NSPS Subpart VVa requires that an owner or operator of an affected facility must identify connectors subject to NSPS Subpart VVa except for instrumentation systems and inaccessible, ceramic, or ceramic-lined connectors meeting the provisions of Section 60.482-11a(f).  40 C.F.R. § 60.482-11a(g).

109.    NSPS Subpart VVa requires that an owner or operator of an affected facility shall initially monitor for leaks at connectors in gas/vapor or light liquid service within twelve months of startup. 40 C.F.R. § 60.482-11a(a).

110.    NSPS Subpart VVa requires that an owner or operator of an affected facility shall subsequently remonitor connectors in gas/vapor or light liquid service at a rate based upon the percentage of leaking connectors. 40 C.F.R. § 60.482-11a(b)(3).

111.    NSPS Subpart VVa requires that an owner or operator of an affected facility shall keep a record of the start date and end date of each monitoring period for each process unit. 40 C.F.R. § 60.482-11a(b)(3)(v).

112.    For purposes of 40 C.F.R. §§ 60.482-7a and 60.482-11a, a leak is detected if the detection instrument reading is 500 ppm or greater. 40 C.F.R. §§ 60.482-7a(b) & 60.482-11a(b)(2).

### 6.    *NSPS Subpart NNN*

113.    EPA promulgated NSPS Subpart NNN on June 29, 1990. 55 Fed. Reg. 26,942.

114.    NSPS Subpart NNN applies to each affected facilities that are part of a process unit that produces any of the chemicals listed in 40 C.F.R. § 60.667 as a product, co-product, by-product, or intermediate, unless exempted under 40 C.F.R § 60.660(c).  40 C.F.R. § 60.660(a).

115.    NSPS Subpart NNN at 40 C.F.R. § 60.660(b) states that the affected facilities are any of the following for which construction, modification, or reconstruction commenced after December 30, 1983:

116.    Each distillation unit not discharging its vent stream into a recovery system.

117.    Each combination of a distillation unit and the recovery system into which its vent stream is discharged.

118.    Each combination of two or more distillation units and the common recovery system into which their vent streams are discharged.

119.    NSPS Subpart NNN defines "distillation operation" as an operation separating one or more feed stream(s) into two or more exit stream(s), each exit stream having component

concentrations different from those in the feed stream(s). The separation is achieved by the redistribution of the components between the liquid and vapor-phase as they approach equilibrium within the distillation unit. 40 C.F.R. § 60.661.

120.    NSPS Subpart NNN defines "distillation unit" as a device or vessel in which distillation operations occur, including all associated internals (such as trays or packing) and accessories (such as reboiler, condenser, vacuum pump, steam jet, etc.), plus any associated recovery system. 40 C.F.R. § 60.661.

121.    NSPS Subpart NNN at 40 C.F.R. § 60.662 states that each owner or operator of any affected facility shall comply with paragraph (a), (b), or (c) of this section for each vent stream on and after the date on which the initial performance test required by 40 C.F.R. § 60.8 and 40 C.F.R. § 60.664 is completed, but not later than 60 days after achieving the maximum production rate at which the affected facility will be operated, or 180 days after the initial start-up, whichever date comes first.

122.    NSPS Subpart NNN at 40 C.F.R. § 60.663 sets forth the monitoring of emissions and operations for control devices including flares, boilers, or process heaters, and condensers used as a final recovery device in a recovery system.

123.    NSPS Subpart NNN, at 40 C.F.R. § 60.664, sets forth requirements for conducting an initial performance test to demonstrate compliance.

124.    NSPS Subpart NNN at 40 C.F.R. § 60.665(a) states that each owner or operator subject to 40 C.F.R. § 60.662 shall notify the Administrator of the specific provisions of 40 C.F.R. § 60.662 with which the owner or operator has elected to comply. Notification shall be submitted with the notification of initial start-up required by 40 C.F.R. § 60.7(a)(3). If an owner or operator elects at a later date to use an alternative provision of 40 C.F.R. § 60.662 with which he or she will

comply, then the Administrator shall be notified by the owner or operator 90 days before implementing a change, and upon implementing the change, a performance test shall be performed as specified by 40 C.F.R. § 60.664 within 180 days.

125. NSPS Subpart NNN at 40 C.F.R. § 60.665(b) states that each owner or operator subject to the provisions of this subpart shall keep an up-to-date, readily accessible record of the following data measured during each performance test, and also include the following data in the report of the initial performance test required under 40 C.F.R. § 60.8. Where a boiler or process heater with a design heat input capacity of 44 megawatts ("MW") (150 million Btu/hour) or greater is used to comply with 40 C.F.R. § 60.662(a), a report containing performance test data need not be submitted, but a report containing the information in 40 C.F.R. § 60.665(b)(2)(i) is required. The same data specified in this section shall be submitted in the reports of all subsequently required performance tests where either the emission control efficiency of a control device, outlet concentration of total organic concentration, or the total resource effectiveness index value of a vent stream from a recovery system is determined.

### 7. *NSPS Subpart Kb*

126. EPA promulgated NSPS Subpart Kb on April 8, 1987. See 52 Fed. Reg. 11,429.

127. Subpart Kb at 40 C.F.R. § 60.110b(a) states that except as provided in paragraph (b) of this section, the affected facility to which this subpart applies is each storage vessel with a capacity greater than or equal to 75 cubic meters ("m3") that is used to store volatile organic liquids ("VOL") for which construction, reconstruction, or modification is commenced after July 23, 1984.

128. Subpart Kb at 40 C.F.R. § 60.112b(a) states that the owner or operator of each storage vessel either with a design capacity greater than or equal to 151 m3 containing a VOL that,

as stored, has a maximum true vapor pressure equal to or greater than 5.2 kiloPascal ("kPa") but less than 76.6 kPa or with a design capacity greater than or equal to 75 m3 but less than 151 m3 containing a VOL that, as stored, has a maximum true vapor pressure equal to or greater than 27.6 kPa but less than 76.6 kPa, shall equip each storage vessel with one of four compliance options, including a closed vent system and control device meeting the following specifications:

129.    The closed vent system shall be designed to collect all VOC vapors and gases discharged from the storage vessel and operated with no detectable emissions as indicated by an instrument reading of less than 500 ppm above background and visual inspections, as determined in Part 60, Subpart VV, 40 C.F.R. § 60.485(b).

130.    The control device shall be designed and operated to reduce inlet VOC emissions by 95 percent or greater. If a flare is used as the control device, it shall meet the specifications described in the general control device requirements (§ 60.18) of the General Provisions. 40 C.F.R. § 60.112b(a)(3).

### 8.    *NSPS Subpart Db*

131.    EPA promulgated 40 C.F.R. Part 60, Subpart Db on June 13, 2007.  72 Fed. Reg. 32742.

132.    Subpart Db at 40 C.F.R. §§ 60.40b-49b provides that the owner or operator of an affected facility with a steam generating unit with a design firing rate greater than 29 MegaWatts/100 MM BTU/hr for which construction, modification, or reconstruction commenced after June 9, 1989, shall: submit an initial notification in accordance with 40 C.F.R. § 60.49b; conduct an initial performance test in accordance with 40 C.F.R. § 60.46b; conduct emission monitoring of NOx, and comply with 40 C.F.R. § 60.48b(b) through (e); continuously comply with

the limit of 0.10 lb/MM Btu as required by 40 § 60.44b(a); and report and record as required by 40 C.F.R. § 60.49b.

  **9.**  *NSPS Subpart KKKK*

  133. EPA promulgated 40 C.F.R. Part 60, Subpart KKKK (Standards of Performance for Stationary Combustion Turbines) on July 6, 2006.  71 Fed. Reg. 38497.

  134. Subpart KKKK at 40 C.F.R. § 60.4375(b) provides that the owners or operators of certain affected units must perform annual performance tests in accordance with § 60.4340(a) and must submit a written report of the results of each performance test before the close of business on the 60th day following the completion of the performance test.

**F.**  **National Emission Standards for Hazardous Air Pollutants**

  135. Section 112(d) of the Clean Air Act authorizes the Administrator of the EPA to promulgate regulations establishing emission standards for, *inter alia*, "major sources" of HAPs. 42 U.S.C. § 7412(d).

  136. A "major source" under Section 112 is any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

  137. HAPs are chemical compounds listed in Section 112(b) of the Clean Air Act which present or may present a threat of adverse human health effects or adverse environmental effects. 42 U.S.C. § 7412(b).

  138. No person is permitted to operate a major source in violation of an applicable emission standard after it has gone into effect. 42 U.S.C. § 7412(i)(3).

139.   EPA promulgated regulations that contain general provisions applicable to sources that are subject to the standards of Part 63 of Title 40 of the Code of Federal Regulations. 40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16 ("NESHAP Subpart A").

140.   Under NESHAP Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any hazardous air pollutant listed in or pursuant to section 112(b) of the Act; and (ii) is subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b).

141.   Under NESHAP Subpart A, each relevant standard in Part 63 must identify explicitly whether each provision in NESHAP Subpart A is or is not included in such relevant standard. 40 C.F.R. § 63.1(a)(4)(i).

142.   Within NESHAP Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices. 40 C.F.R. § 63.11(b).

143.   Of relevance to this complaint is the following requirement: the NHV of the gas being combusted in a flare shall be calculated using an equation specified in 40 C.F.R. § 63.11(b)(6)(ii).

144.   In 1999, the EPA promulgated under Section 112 of the Act "National Emission Standards for Hazardous Air Pollutants from Oil and Natural Gas Production Facilities." 64 Fed. Reg. 32,628 (June 17, 1999). The EPA amended these standards in 2012.  77 Fed. Reg. 49,568 (Aug. 16, 2012). These standards are set forth in 40 C.F.R. Part 63, Subpart HH ("NESHAP Subpart HH"), which includes 40 C.F.R. §§ 63.760–77.

145.   Each of these standards is an "emission standard" within the meaning of Section 112(d) of the Clean Air Act, 42 U.S.C. § 7412(d), or a "design, equipment, work practice, or

operational standard, or combination thereof" under Section 112(h) of the Act, 42 U.S.C. § 7412(h).

146.    NESHAP Subpart HH applies to the group of all ancillary equipment, except compressors, intended to operate in volatile hazardous air pollutant (VHAP) service (as defined in 40 C.F.R. § 63.761), which are located at natural gas processing plants that are a major source. 40 C.F.R. § 63.760(b)(1)(iii).

147.    NESHAP Subpart HH specifies that sources which commenced construction or reconstruction before February 6, 1998, shall achieve compliance with the applicable provisions of NESHAP Subpart HH no later than June 17, 2002.  40 C.F.R. § 63.760(f)(1).

148.    NESHAP Subpart HH specifies that sources which commenced construction or reconstruction on or after February 6, 1998, shall achieve compliance with the applicable provisions of NESHAP Subpart HH immediately upon startup or June 17, 1999, whichever date is later. 40 C.F.R. § 63.760(f)(2).

149.    NESHAP Subpart HH defines "ancillary equipment" as any of the following pieces of equipment: pumps, pressure relief devices, sampling connection systems, open-ended valves, or lines, valves, flanges, or other connectors. 40 C.F.R. § 63.761.

150.    NESHAP Subpart HH defines "in VHAP service" to mean a piece of ancillary equipment or compressor that either contains or contacts a fluid (liquid or gas), which has a total VHAP concentration equal to or greater than 10 percent by weight as determined according to the provisions in 40 C.F.R. § 63.772(a). 40 C.F.R. § 63.761.

151.    NESHAP Subpart HH defines "in wet gas service" to mean a piece of equipment that contains or contacts the field gas before the extraction of natural gas liquids. 40 C.F.R. § 63.761.

152.    NESHAP Subpart HH defines "natural gas processing plant" as any processing site engaged in the extraction of natural gas liquids (NGL) from field gas, or the fractionation of mixed NGL to natural gas products, or a combination of both. 40 C.F.R. § 63.761.

153.    NESHAP Subpart HH defines "hazardous air pollutants or HAP" as the chemical compounds listed in Section 112(b) of the CAA. All chemical compounds listed in Section 112(b) of the CAA need to be considered when making a major source determination. Only the HAP compounds listed in Table 1 of NESHAP Subpart HH need to be considered when determining compliance. 40 C.F.R. § 63.761.

154.    NESHAP Subpart HH, at 40 C.F.R. § 63.769(c), specifies that for each piece of ancillary equipment and each compressor located at an existing or new source, the owner or operator shall meet the requirements of the National Emission Standard for Equipment Leaks (40 C.F.R. Part 61, Subpart V), 40 C.F.R. §§ 61.241 – 247 ("NESHAP Subpart V").

155.    NESHAP Subpart HH requires owners and operators of natural gas processing plants to use Method 21 in monitoring leaks of volatile hazardous air pollutants or other regulated pollutants from equipment. 40 C.F.R. §§ 63.769(c) & 61.245(b). For purposes of NESHAP Subpart HH, a leak is detected from valves in natural gas processing plants if the detection instrument reading is 500 ppm or greater. 40 C.F.R. § 63.769(c).

156.    NESHAP Subpart V, at 40 C.F.R. § 61.242-7(d)(1) and (2), specifies that when a leak is detected at a valve, it shall be repaired as soon as practicable, but not later than 15 calendar days after it is detected and that a first attempt at repair shall be made no later than five calendar days after each leak is detected. NESHAP Subpart HH, 40 C.F.R. § 63.769(c), modifies this requirement, such that a leak detected from a valve at a source constructed: (1) on or before August 23, 2011, shall be repaired in accordance with the schedule in 40 C.F.R. § 61.242-7(d), or by

October 15, 2013, whichever is later; or (2) after August 23, 2011, shall be repaired in accordance with the schedules in 40 C.F.R. § 61.242-7(d), or by October 15, 2012, whichever is later.

157. NESHAP Subpart V, at 40 C.F.R. § 61.246(b), sets forth the recordkeeping requirements for leaking components.

158. NESHAP Subpart HH, at 40 C.F.R. § 63.775(e)(2)(iv), states that owners and operators subject to the provisions specified in 40 C.F.R. § 63.769 shall comply with the reporting requirements specified in 40 C.F.R. § 61.247.

159. On July 8, 2013, EPA approved a delegation of authority to the Southern Ute Indian Tribe to implement and enforce certain NESHAPs on the Southern Ute Indian Reservation. 78 Fed. Reg. 40635 (July 8, 2013).

## G. Enforcement Provisions

160. Section 113 of the CAA, 42 U.S.C. § 7413, authorizes EPA to commence a civil action for injunctive relief and/or civil penalties against any person who has violated any requirement or prohibition of the CAA or regulations promulgated thereunder, or who has violated any applicable permit or implementation plan.

161. On July 8, 2013, EPA approved a delegation of authority to the Southern Ute Indian Tribe to implement and enforce certain NSPS on the Southern Ute Indian Reservation. 78 Fed. Reg. 40635 (July 8, 2013).

162. On June 2, 1987, EPA approved delegation of authority to Alabama to implement and enforce certain NSPS in the state.

163. Effective January 25, 1982, EPA has delegated to LDEQ the authority to implement and enforce the NSPS program. See 47 Fed. Reg. 7665 (Feb. 22, 1982); 69 Fed. Reg. 15687 (March 26, 2004); 75 Fed. Reg. 19252 (April 14, 2010); 80 Fed. Reg. 9,613 (Feb. 24, 2015).

164. Effective October 12, 1995, EPA has approved Louisiana's Title V operating permit program ("Operating Permit Program"). *See* 40 C.F.R. Part 70, Appendix A; 60 Fed. Reg. 47,296 (Sept. 12, 1995). LDEQ's approved Operating Permit Program is located at LAC 33:III.Chapter 5 ("Permit Procedures").

165. Through two rulemakings, EPA approved a delegation of authority to the State of West Virginia through the WVDEP to implement and enforce certain NSPS.  49 Fed. Reg 48692 (December 14, 2984); 67 Fed. Reg. 15486 (April 2, 2002).

166. Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note), as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701), and 40 C.F.R. § 19.4, EPA may seek penalties of up to $37,500 per day for violations of the CAA that occurred after January 12, 2009 through November 2, 2015, and up to $102,638 per day for violations that occurred after November 2, 2015.

## GENERAL ALLEGATIONS

167. Defendants are, or were at relevant times, the "owner and operator" of the Covered Facilities within the meaning of Section 111(a)(5) of the Act, 42 U.S.C. § 7411(a)(5).

168. The Covered Facilities each include a building, structure, facility, or installation which emits or may emit an air pollutant.

169. The Covered Facilities are each a "new source" and a "stationary source" within the meaning of Sections 111(a)(2) and (a)(3) of the Act, 42 U.S.C. §§ 7411(a)(2) and (a)(3).

170. The Covered Facilities are "natural gas processing plants" as defined in 40 C.F.R. §§ 60.631, 60.5430, and 63.761.

171.    When pumps, valves, and connectors, or other equipment used at the Covered Facilities leak, they can release VOCs and HAPs into the atmosphere.

## A.    The Ignacio Facility

172.    The Ignacio Facility receives natural gas from the San Juan Gathering Systems, a 5,300-mile pipeline system gathering field gas (i.e., unprocessed natural gas from wells) from the San Juan Basin in southwest Colorado and Northwest New Mexico. The Ignacio Facility operations include, among other things, compression, dehydration, carbon dioxide removal, natural gas liquids removal, fractionation, and storage. The Ignacio Facility has the capacity to process approximately 500 to 650 million standard cubic feet (MMscfd) of field gas per day into market-ready natural gas liquids and residue gas.

173.    The Ignacio Facility has seven process units as defined in Subparts KKK and OOOO, including the Inlet, TXP (Cryo), and Storage & Loading process units.

174.    The Inlet, TXP, and Storage & Loading process units each contain various equipment including pumps, valves, and connectors.

175.    The Inlet and Storage & Loading process units at the Ignacio Facility were constructed in 1956. The TXP (Cryo) process unit was constructed in 1984.

176.    Modifications were made to the Inlet process unit at the Ignacio Facility in 2015, resulting in that process unit becoming subject to NSPS Subpart OOOO.

177.    In Williams FC's July 21, 2017, semiannual report submitted pursuant to Part 60, Subpart KKK, Williams FC identified the Storage & Loading and TXP process units as being subject to NSPS Subpart KKK.

178.    The Inlet process unit is an "affected facility" for purposes of NSPS Subpart OOOO.

179.     The Storage & Loading and TXP process units are "affected facilities" for purposes of NSPS Subpart KKK.

180.     The Ignacio Facility has the potential to emit more than 250 tons per year of nitrogen oxides, carbon monoxide, and VOCs.

181.     At all relevant times for this complaint, the Ignacio Facility has been a major source within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and NESHAP Subpart HH, 40 C.F.R. §§ 63.2 and 63.761, because the total HAP emissions at the facility are above the major source thresholds of 10 tpy of a single HAP (formaldehyde = 33.3 tpy) and 25 tpy of aggregated HAPs (total HAPs = 81.7 tpy). Therefore, certain ancillary equipment, except compressors, intended to operate in VHAP service at the facility are subject to the equipment leak standards of NESHAP Subpart HH.

182.     The Ignacio Facility is a "major emitting facility" subject to the preconstruction requirements in 42 U.S.C. § 7475.

183.     On December 22, 2010, the EPA issued a PSD permit to Williams FC for the Ignacio Facility (Permit Number, PSD-SU-00027-01.00).

184.     Section III.G.1 of the December 22, 2010, PSD permit establishes that BACT for VOC emissions from the East Dehydrator emission unit at the Ignacio Facility is a thermal oxidizer.

185.     As configured at the time of the December 22, 2010, PSD permit, the thermal oxidizer at the Ignacio Facility received and controlled the emissions from the Amine Treatment system.

186.     Section III.G.1 of the December 22, 2010, PSD permit establishes a VOC emission limit of 1.16 lbs per hour and 5.1 tons per year for the thermal oxidizer when both the Amine Treatment system and East Dehydrator are operating.

187.     Section III.G.5 of the December 22, 2010, PSD permit requires an annual stack test to determine the effectiveness of the thermal oxidizer in controlling VOC emissions, including control at or below the permitted emission rate.

188.     On November 19, 2003, the EPA issued the initial Title V operating permit for the Ignacio Facility (Permit Number V-SU-0027-00.0).

189.     On January 28, 2013, the EPA issued the First Renewal Title V Operating Permit for the Ignacio Facility (Permit Number V-SU-000027-2008.00) (hereinafter, the "January 28, 2013 Federal Title V Permit").

190.     The January 28, 2013 Federal Title V Permit was issued to both Williams Companies and Williams Four Corners, LLC. The Permit names "Williams Companies" as the parent company and "Williams Four Corners, LLC" as the plant operator.

191.     Section VIII.F.1 of the January 28, 2013 Federal Title V Permit establishes that BACT for VOC emissions from the East Dehydrator is a thermal oxidizer.

192.     Section VIII.F.1 of the January 28, 2013 Federal Title V Permit establishes a VOC emission limit of 1.16 lbs per hour and 5.1 tons per year for the thermal oxidizer when both the Amine Treatment system and East Dehydrator are operating.

193.     Section VIII.F.5 of the January 28, 2013 Federal Title V Permit requires an annual stack test to determine the effectiveness of the thermal oxidizer in controlling VOC emissions, including control at or below the permitted emission rate.

194.     Section III.F of the December 22, 2010 PSD permit establishes that BACT for VOC emissions from the West Dehydrator is a Flare with emissions not to exceed 6.7 tons per year.

195.     Section III.F.6 of the December 22, 2010, PSD permit requires that at all times including periods of startup, shutdown, and equipment malfunction, the Permittee shall maintain and operate the West Dehydrator (and the associated Flare, required under Section III.F as BACT) in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used was to be based on information available to the Administrator, which may include, but not be limited to, monitoring results, review of operating and maintenance procedures, and inspection of the permitted facility.

196.     Section VIII.E.1 of the January 28, 2013 Federal Title V Permit incorporates the December 22, 2010 PSD requirement that BACT for VOC emissions from the West Dehydrator is a Flare with emissions not to exceed 6.7 tons per year.

197.     Section VIII.E.6 of the January 28, 2013 Federal Title V Permit requires that at all times, including periods of startup, shutdown, and equipment malfunction, the Permittee shall maintain and operate the West Dehydrator (and the associated Flare, required under Section VIII.E.1 as BACT) in a manner consistent with good air pollution control practices for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used was to be based on information available to the Administrator, which may include, but not be limited to, monitoring results, review of operating and maintenance procedures, and inspection of the permitted facility.

198.    The EPA conducted onsite inspections at the Ignacio Facility on June 13, 2013 and July 17, 2014. The EPA finalized inspection reports following the inspections on December 16, 2013, and February 2, 2015, respectively.

199.    On August 25, 2014, Williams FC notified the EPA that certain equipment subject to NESHAP Subpart HH at the Ignacio Facility may not have been properly included in the Ignacio Facility's LDAR program.

200.    Williams FC submitted a thermal oxidizer test report to the EPA on October 20, 2015, for the testing conducted on August 20 and 21, 2015. The test report shows that the thermal oxidizer was emitting at 1.18 lbs per hour of VOC and 5.2 tons per year of VOC when both the Amine Treatment and East Dehydrator were operating.

201.    In its September 21, 2016, Title V semi-annual report, Williams FC reported that the Ignacio Facility exceeded the VOC limit of 1.16 lbs per hour for the thermal oxidizer from August 20, 2015, through July 28, 2016.

202.    EPA issued a request for information pursuant to 42 U.S.C. § 7414 to Williams FC on December 1, 2015; Williams FC initially responded on February 2, 2016, and provided a supplemental response on March 4, 2016.

203.    In Attachment 7 of the March 4, 2016, response, Williams FC acknowledged that changes to the Inlet process unit constituted a modification for purposes of NSPS Subpart OOOO under the Act.

204.    The EPA again inspected the Ignacio Facility on June 22, 2016, and observed, with an optical gas imaging camera, un-combusted hydrocarbons being emitted from the flare.

205.    EPA issued a second request for information pursuant to Section 114 of the Act, 42 U.S.C. § 7414, to Williams FC on January 19, 2017; Williams FC responded on March 24, 2017.

206.   In its March 24, 2017 response to the CAA Section 114 request for information, Williams FC provided steam flow rates and steam-to-vent gas ratios recommended by the flare manufacturer. Williams FC also provided the monitored or estimated amount of flare gas and steam sent to the flare, as well as the steam-to-vent gas ratio, on an hourly basis between January 1, 2012, and January 1, 2017.

207.   Based on the EPA's review of the information provided in the March 24, 2017 response to the CAA Section 114 request for information, the actual steam-to-vent gas ratio of the flare exceeded the manufacturer's recommendation on several occasions.

208.   In its March 24, 2017 response to the CAA Section 114 request for information, Williams FC provided the net heating value (NHV) of the flare gas in BTU/scf. Based on the EPA's review of this information, the NHV was below 1,000 BTU/scf on several occasions.

209.   On June 5, 2017, the Southern Ute Indian Tribe issued a Title V operating permit for the Ignacio Facility (Permit Number V-SUIT-0027-2017.00) under its authority as administrator of the Title V operating permit program on the Southern Ute Indian Reservation (hereinafter, the "June 5, 2017 Tribal Title V Permit").

210.   Section 4.4.1 of the June 5, 2017 Tribal Title V Permit incorporates the December 22, 2010 PSD requirement that BACT for VOC emissions from the West Dehydrator is a flare with emissions not to exceed 6.7 tons per year.

211.   Section 4.4.6 of the June 5, 2017 Tribal Title V Permit requires that at all times, including periods of startup, shutdown, and equipment malfunction, the Permittee shall maintain and operate the West Dehydrator (and the associated Flare, required under Section 4.4.1 as BACT) in a manner consistent with good air pollution control practices for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used was to

36

be based on information available to the Administrator, which may include, but not be limited to, monitoring results, review of operating and maintenance procedures, and inspection of the permitted facility.

212.     On December 7, 2018, the Southern Ute Indian Tribe issued a revised Title V permit for the Ignacio Facility to Harvest Four Corners, LLC (Permit Number V-SUIT-0027-2017.01) (hereinafter, the "December 7, 2018 Tribal Title V Permit").

213.     The substantive requirements of Sections 4.4.1 and 4.4.6 of the December 7, 2018 Tribal Title V Permit remained the same as those in the June 5, 2017 Tribal Title V Permit.

214.     In a March 25, 2020, communication to the Southern Ute Indian Tribe (hereinafter, the "March 25, 2020 Harvest Letter"), Harvest reported that it used an Ultrasonic Meter and "engineering calculations" to determine the NHV of the flare gas.

215.     In the March 25, 2020 Harvest Letter, Harvest stated that it did not apply the methodology prescribed by 40 C.F.R. §§ 60.18(f)(3) and 63.11(b)(6)(ii) until January 31, 2020.

216.     In the March 25, 2020 Harvest Letter, Harvest stated that over-steaming had caused the un-combusted hydrocarbons observed during the June 22, 2016 inspection.

217.     Williams FC, Williams Companies, and Harvest have failed to maintain the steam pots/water knockouts in the steam line for the flare free from clogs and/or other blockages at all times.

218.     Williams FC, Williams Companies, and Harvest have failed to maintain the automated steam input settings of the steam control system of the flare in a manner to assure proper operation when steam inputs exceeded 2,500 pounds per hour.

219.    Williams FC, Williams Companies, and Harvest have failed to maintain the steam input control system in a manner to assure expeditious adjustments to steam input when gas volumes sent to the flare decrease rapidly.

220.    EPA issued a Notice of Violation to Williams FC for alleged violations at the Ignacio Facility on March 16, 2018.

221.    After representatives of Williams FC, Williams Companies, and the United States met in June 2018, a written response to the Notice of Violation for the Ignacio Facility was provided on July 20, 2018 ("the Williams FC NOV Response").

222.    On September 25, 2019, and September 28, 2020, the Southern Ute Indian Tribe ("Tribe") inspected the Ignacio Plant to evaluate compliance with the December 7, 2018, Tribal Title V Permit ("Tribe's 2018 Title V Permit").

223.    Based on the September 2019 and September 2020 inspections, as described in Paragraphs 224 through 229 below, the Tribe found certain alleged violations of the CAA and the Tribe's 2018 Title V Permit.

224.    On May 17, 2019, Harvest conducted performance testing on Turbine emission units 27, 28 and 29. The written results of the performance tests were not provided to the Tribe until October 1, 2019, eighty-seven days past the sixty-day deadline of July 6, 2019. On July 1, 2020, Harvest conducted performance testing on Turbine emission units 30 and 31. The written results of the performance tests were not provided to the Tribe until October 1, 2020, thirty-two days past the sixty-day deadline of August 30, 2020.

225.     Harvest's site-specific monitoring plan did not include equipment performance checks, system accuracy audits or other audit procedures, or ongoing operation and maintenance procedures.

38

226.    Harvest failed to submit semiannual periodic reports for the compliance reporting periods of January 1 through June 30, 2018 and July 1 through December 31, 2018.

227.    No Notification of Intent (NOI) was submitted for the performance evaluation conducted on emission unit 22, a thermal oxidizer control device, on June 18, 2019. No NOI was submitted for the performance evaluations conducted on emission unit 23, a process flare, on July 16, 2018 and July 26, 2019.

228.    Harvest failed to submit to the Tribe the results of a stack test conducted on emission unit 22, a thermal oxidizer, within forty-five days after completion of the test on May 7, 2019, as required by a Prevention of Significant Deterioration permit and permit provision III.4.5.4.4. of the Tribe's 2018 Title V Permit. Harvest submitted the results of the stack test on October 1, 2019, one-hundred and two days late.

229.    Based on the serial numbers observed during the September 25, 2019 inspection for Turbine emission units 27 and 28, the units were exchanged after the previous tribal inspection of the facility on September 18, 2018. The Tribe received no records of these exchanges from Harvest when requested during the 2020 inspection.

230.    On December 8, 2021, the Tribe provided a summary of alleged violations to Harvest based on the Tribe's September 2019 and September 2020 inspections.

231.    The Ignacio Facility contains affected facilities as described in 40 C.F.R. §§ 60.630(a)(3) and 60.5365(f), and affected sources as described in § 63.760(b)(1)(iii).

**B.      The Mobile Bay Facility**

232.    The Mobile Bay Facility is an onshore natural gas processing plant located at 6000 Rock Road Coden, Alabama 36523.

233. The Mobile Bay Facility is a "major emitting facility" subject to the preconstruction requirements in Section 165 of the CAA, 42 U.S.C. § 7475.

234. On December 4, 2017, Williams MBPS commenced start-up of an expansion project at the NGL Extraction Process unit involving the installation of new or replacement equipment to accommodate more natural gas condensate liquids from a new inlet stream.

235. The changes Williams MBPS made at the NGL Extraction Process unit meet the definition of the term "modification" in 40 C.F.R § 60.14.

236. The NGL Extraction process unit is an "affected facility" for purposes of NSPS Subpart OOOOa.

237. On December 15, 2016, Williams MBPS submitted a permit application to the Alabama Department of Environmental Management ("ADEM") for the installation of a number of equipment and process unit piping components related to the ongoing Project at the NGL Extraction process unit. Williams' permit application identified NSPS OOOOa as applicable to the new process piping components. On March 7, 2017, ADEM issued two permits: Permits Nos. 503-8056-X010 and 503-8056-X011. Condition 2 of Permit No. 503-8056-X011, under the section "Emission Standard for Equipment in VOC Service," identified NSPS OOOOa as applicable.

238. In a "Notification Letter" dated March 7, 2018, Williams MBPS acknowledged that the Mobile Bay Facility became subject to NSPS OOOOa on December 4, 2017.

239. On April 17-19, 2018, a team of EPA inspectors conducted an on-site inspection of the Mobile Bay Facility. During the Inspection, an infrared camera, toxic vapor analyzers (TVA), and four-gas personal safety monitors were used to evaluate components in the various process units at the Facility. Monitoring was conducted in the condensate stabilization, inlet and gathering, and natural gas liquid dehydration process units; and natural gas liquid extraction trains 1 and 2.

At the time of the Inspection, the EPA inspectors also obtained an electronic copy of the Mobile Bay Facility's LDAR database for the time period from April 2011 through April 18, 2018.

240.     On March 25, 2018, EPA obtained documentation from Williams MBPS about the ongoing expansion project confirming that the Mobile Bay Facility became subject to NSPS OOOOa on December 4, 2017, the start-up date of the Project.

**C.      The Parachute Creek Facility**

241.     The Parachute Creek Facility, including each process unit, was constructed between 2002 and 2009.

242.     The Parachute Creek Facility receives field gas from approximately twenty compressor stations in the Pieceance Basin. The facility operations include, among other things, compression, dehydration, carbon dioxide removal, and natural gas liquids extraction and storage. The facility-wide capacity of the Parachute Creek Facility is 940 million cubic feet per day (MMcf/d).

243.     The Parachute Creek Facility consists of four processing trains (referred to by Bargath as Plant 1, Plant 2, Plant 3, and Plant 3.5).

244.     Prior to November 2016, Bargath had not identified the process units in such a way as to comply with NSPS Subpart KKK.

245.     Subsequent to November 2016, Bargath identified the following process units at the Parachute Creek Facility: Plant 1 Inlet, Plant 1 Processing, Plant 1 Flare, Plant 2 Inlet, Plant 2 Processing, Plant 2 Flare, Plant 2 Triethylene Glycol (TEG) Dehydration, Plant 2 NGL Storage, Plant 3 Inlet, Plant 3 Processing, Plant 3 Compression, Plant 3.5 Inlet, Plant 3.5 Processing, Plant 3.5 Compression, Plant 3 & 3.5 Flare, Condensate, and PGX natural gas liquids storage. These process units include various equipment including pumps, valves, and connectors.

246.     Bargath has stated in semiannual reports to EPA that the Parachute Creek Facility is subject to the LDAR requirements in Subparts KKK and HH.

247.     EPA conducted an on-site inspection of the Parachute Creek Facility on July 11 and 12, 2016. During the inspection, EPA requested a copy of Bargath's LDAR database, which was provided electronically to EPA on September 16, 2016.

248.     On September 16, 2016, Bargath notified EPA that valves at the Parachute Creek Facility subject to NESHAP Subpart HH requirements were not repaired as required.

249.     EPA issued a Notice of Violation to Bargath for alleged violations at the Parachute Creek Facility on March 16, 2018.

250.     After representatives of Bargath, Williams Companies, and the United States met in June of 2018, a written response to the Notice of Violation for the Parachute Creek Facility was provided on July 20, 2018 ("the Bargath NOV Response").

251.     The Parachute Creek Facility is a major source under NESHAP Subpart HH because the total HAP emissions at the facility are above the major source thresholds of 10 tpy of a single HAP (formaldehyde = 14.4 tpy) and 25 tpy of aggregated HAPs (total HAPs = 61.9 tpy).

252.     The Parachute Creek Facility contains affected facilities as described in 40 C.F.R. §§ 60.630, 60.5365(f), and affected sources as described in 63.760(b)(1)(iii).

## D.     Willow Creek Facility

253.      The Willow Creek Facility receives processed and unprocessed gas from the Piceance Lateral Pipeline and raw unprocessed gas from the Ryan Gulch Compressor Station.

254.     The Willow Creek Facility contains affected facilities as described in 40 C.F.R. § 60.5365a(f).

255.     The State of Colorado Air Pollution Control Division issued Colorado Operating Permit #10OPRB351 ("Willow Creek Permit") to the Willow Creek Facility on November 1, 2018, and it was revised on June 3, 2021.

256.     The Willow Creek Permit requires compliance with applicable requirements of 40 C.F.R. 60 subparts A, KKK, and OOOOa and Colo.Code.Regs. §§ 1001-8, -9, and -10 to control emissions of VOCs from leaking components at the Willow Creek Facility.

**E.     Conway Facility**

257.     The Conway Facility is a liquified petroleum gas/natural gas fractionation and treatment facility that processes demethanized natural gas liquid using distillation towers and other processes into five products: ethane (80%)/propane (20%) mix, propane, isobutane, N-butane, and natural gasoline. The products are stored in underground caverns or routed to petrochemical facilities via export distribution pipelines.

258.     On March 26 through March 27, 2018, a National Enforcement Investigations Center (NEIC) team of EPA inspectors conducted a CAA inspection of the Conway Facility and obtained a Class I Operating Permit Application, dated December 1, 2017. The Class I Operating Permit Application indicates that portions of the Conway Facility had been modified, triggering NSPS Subpart OOOOa applicability for the Frac process unit, the Refrigeration process unit, the Flare process unit, and the Amine/Merox process unit.

259.     On April 18, 2018, Mid-Continent Fractionation and Storage, LLC, submitted a notification to EPA, purporting to satisfy the requirements of 40 C.F.R. §§ 60.5420a and 60.7(a)(4), notifying EPA that a pressure safety valve project (PSV project) had caused the Conway Facility to be subject to NSPS Subpart OOOOa. The letter indicated that the project would be complete on April 20, 2018.

260.     On June 15, 2018, a representative of EPA informally requested, by email sent to a representative of Williams, additional information related to the March 2018 EPA inspection. On July 5, 2018, a representative of Williams responded to EPA's informal request with additional information concerning the PSV project and the Conway Facility's progress towards compliance with NSPS Subpart OOOOa. According to the July 5, 2018 email, the PSV project was installed in two phases, with Phase 1 beginning on November 8, 2015, and Phase 2 beginning on April 11, 2016. In addition, the email indicates that initial LDAR monitoring pursuant to the requirements of NSPS Subpart OOOOa was completed on May 31, 2018.

261.     According to a May 31, 2018 initial semiannual report for the Conway Facility submitted pursuant to 40 C.F.R. § 60.5422a(b), a total of 49 pressure relief devices, 4,254 valves, 55 pumps, and 49,325 connectors at the Conway Facility were subject to NSPS Subpart OOOOa.

262.     The PSV project is a "capital expenditure" as that term is defined in 40 C.F.R. §§ 60.2 and 60.5430a

263.     The PSV project meets the definition of "modification" in 40 C.F.R § 60.14 and represents the addition or replacement of equipment for purposes of process improvement pursuant to 40 C.F.R. § 60.5365a(f)(1).

264.     The Conway Facility contains affected facilities as described in 40 C.F.R. § 60.5365a(f).

265.     The Conway Facility has at least four process units that are subject to NSPS Subpart OOOOa: the Frac process unit, the Refrigeration process unit, the Flare process unit, and the Amine/Merox process unit. These process units include various equipment including pumps, valves, and connectors.

266.    The Conway Facility is subject to the LDAR requirements in Part 60, Subpart OOOOa (and by reference NSPS Subpart VVa).

**F.     Larose Facility**

267.    The Larose Facility is an onshore natural gas processing plant located at 1474 Highway 24, Larose, Louisiana.

268.    Raw natural gas is piped to the Larose Facility from various fields where it is dehydrated and cryogenically separated.

269.    The Larose Facility is subject to the LDAR requirements in NSPS Subpart KKK (and by reference NSPS Subpart VV), NSPS Subpart OOOO (and by reference NSPS Subpart VVa), and NESHAP Subpart HH.

270.    The Larose Facility previously operated under Part 70 Operating Permit Nos. 1560-00120-V12. Effective January 27, 2023, LDEQ issued Permit No. 1560-00120-V13 to Discovery Producer Services, LLC.

**G.     Paradis Facility**

271.    The Paradis Facility is an onshore natural gas processing plant located at 15849 Old Spanish Trail, Paradis, Louisiana.

272.    The Paradis Facility is a fractionation plant consisting of a series of distillation towers which separate the inlet natural gas liquids stream into ethane, propane, butane, and natural gasoline.

273.    The Paradis Facility is subject to the LDAR requirements in NSPS Subpart KKK (and by reference NSPS Subpart VV) and NSPS Subpart OOOO (and by reference NSPS Subpart VVa).

274.    The Paradis Facility previously operated under Part 70 Operating Permit No. 2520-00090-V5. Effective July 28, 2022, LDEQ issued Permit No. 2520-00090-V6 to Discovery Producer Services, LLC.

## H.    Harrison Hub Fractionation Facility

275.    The Harrison Hub facility is an onshore natural gas processing plant, located in Scio, Ohio. Through a series of distillation towers (depropanizer and debutanizer towers), the facility fractionates and separates natural gas liquids into separate ethane, propane, butane, and natural gasoline. The facility commenced construction or modification after August 23, 2011 and on or before September 18, 2015.

276.    EPA Region 5 inspectors conducted an inspection of the facility on September 25 through 28, 2017.

277.    During the 2017 inspection, EPA inspectors, among other things, took field measurements using a Toxic Vapor Analyzer and a Forward Looking Infrared (FLIR) camera, and requested information and records, including the Plant's LDAR database that is used to comply with NSPS Subpart OOOO.

278.    During the 2017 inspection, UEOM informed EPA that the Harrison facility includes an enclosed combustor that is used in part to control emissions from pressure relief devices. EPA requested documentation of the initial performance tests demonstrating compliance with the enclosed combustor standards. UEOM was unable to provide documentation because it did not conduct initial performance tests.

279.    During the 2017 inspection, EPA also recorded infrared FLIR videos of emissions from the open ends of two hoses in Truck Loading Lane No.1. Neither was equipped with a cap, a plug, or a second valve to seal the hose.

280.    During the 2017 inspection, UEOM informed EPA that the Harrison facility includes a hot oil process heater fired by natural gas with a design capacity of 150 MMBtu/hr, which was constructed after June 19, 1984, subjecting it to NSPS Subpart Db. EPA requested documentation of the initial performance tests or continuous emission monitoring system (CEMS) data demonstrating compliance with NOx emissions. UEOM was unable to provide documentation of the initial performance tests.

281.    During the 2017 inspection, UEOM informed EPA that the Harrison facility routes pressure relief devices in the railcar loading system (regulated under NSPS Subpart OOOO, and by reference NSPS Subpart VVa) to a storage tank with a fixed roof that is controlled by the enclosed combustor. This system is not a closed vent system required by NSPS Subpart OOOO.

282.    In analyzing the Harrison facility LDAR database, EPA discovered that UEOM did not conduct timely monitoring for a number of valves. EPA also discovered that UEOM did not conduct timely first attempts at repairs and timely final repair for a number of valves.

283.    On February 9, 2018, EPA sent a Finding of Violation to UEOM concerning the violations at the Harrison facility. EPA and UEOM held a CAA Section 113 conference on April 26, 2018.

## I.    Kensington Facility

284.    The Kensington Facility is an onshore natural gas processing plant that is located at 11543 State Route 644, Kensington, Ohio, which removes natural gas liquids from field gas.

285.    The Kensington Facility is subject to the requirements of NSPS Subpart OOOO, and those provisions of NSPS Subpart VVa that are referenced in NSPS Subpart OOOO.

## J.      Markham Facility

286.    The Markham Facility is an onshore natural gas processing plant located at 4367 County Road 403, Markham, Texas.

287.    The Markham facility process sweet natural gas. Inlet gas is dehydrated and cryogenically separated. The natural gas liquids and residue gas are sent to separate pipelines, and there is no fractionation performed onsite.

288.    The Markham Facility is subject to the LDAR requirements in NSPS Subpart OOOOa (and by reference NSPS Subpart VVa) and NESHAP Subpart HH.

## K.      Moundsville Facility

289.    Williams OVM's Moundsville Facility receives natural gas liquids and processes it through a series of distillation processes (depropanizer and debutanizer towers) to generate three products: propane, mixed butanes, and heavier weight organics identified as natural gasoline. The Facility is capable of loading natural gas liquids as received, or any and all of the products, into rail cars and trucks for shipment to markets.

290.    The Moundsville Facility is an onshore natural gas processing plant located at 200 Caiman Drive, Moundsville, West Virginia.

291.    The West Virginia Department of Environmental Protection ("WVDEP") issued a permit to construct the initial fractionation unit, hot oil heater, and flare at the Moundsville Facility to Caiman Eastern Midstream LLC on December 28, 2011 (Permit R13-2892).

292.    Williams OVM purchased the Moundsville Facility on April 27, 2012 during its initial construction.

293.    The Moundsville Facility, as initially constructed, commenced operation on November 22, 2012.

294.    Williams OVM applied to the WVDEP for a permit to modify the Moundsville Facility to add a second fractionation unit and new flare.

295.    WVDEP issued the requested permit on May 28, 2013 (Permit R13-2892C) (hereinafter, the "May 2013 Moundsville Permit").

296.    The May 2013 Moundsville Permit expressly requires Williams OVM to comply with NSPS Subpart OOOO (as well as the cross-referenced requirements of NSPS Subpart VVa) at the Moundsville Facility.

297.    Williams OVM constructed a second fractionation unit and new flare at the Moundsville Facility that commenced operation on February 27, 2014.

298.    WVDEP issued a Title V permit (Permit # R30-05100141-2015) to Williams OVM to operate the Moundsville Facility on November 10, 2015. This permit specifically required Williams OVM to comply with NSPS Subpart OOOO (as well as the cross-referenced requirements of NSPS Subpart VVa) at the Moundsville Facility.

299.    Williams OVM's Moundsville Facility contains the following process units: inlet, storage and loading, fractionation unit 1, fractionation unit 2, rail loading, condensate, and flare (collectively, the "Moundsville Facility Process Units").

300.    The Moundsville Facility Process Units include valves, pumps, and connectors that are and have been in gas/vapor or light liquid service since the startup date of each process unit.

301.    On or about July 23, 2014, EPA conducted a CAA inspection of Williams OVM's Moundsville Facility (the "July 2014 Inspection").

302.    The Moundsville Facility Process Units are "process units" and "affected facilities" within the meaning of NSPS Subpart OOOO.

303.    Williams OVM's Moundsville Facility is subject to the requirements at 40 C.F.R. Part 60, Subpart OOOO, and those provisions of NSPS Subpart VVa that are referenced in NSPS Subpart OOOO.

**L.    Oak Grove Facility**

304.    The Oak Grove Facility is an onshore natural gas processing plant located at 5258 Ford Ridge Road, Moundsville, West Virginia.

305.    The Oak Grove Facility receives field gas from well pads via four inlet lines, then processes the gas to remove impurities and produce methane, ethane, and natural gas liquids ("NGLs"). These products are processed in various units, including the slug catcher, the turbo expander, the stabilizer unit, and the fractionation towers (including debutanizers and de-ethanizers). Once the products have been separated via processing, condensates are routed to storage, methane and ethane are sent off-site via pipelines, and "C3+" (natural gas liquids with the butane and ethane) are sent to other Williams OVM plants (including the Moundsville Facility) via additional pipelines for further processing into propane, butane, and natural gasoline.

306.    On July 12, 2013, the West Virginia Department of Environmental Protection ("WVDEP") issued Permit No. R13-3070 to construct a natural gas processing facility to Williams OVM. WVDEP subsequently issued an amended permit (Permit No. R13-3070A) on January 5, 2016.

307.    On April 26, 2016, WVDEP issued a Title V permit (Permit No. R30-05100157-2016) to Williams OVM for the Oak Grove Facility (the "April 2016 Title V Permit").

308.    The April 2016 Title V Permit expressly requires Williams OVM to comply with NSPS Subpart OOOO (as well as the cross-referenced requirements of NSPS Subpart VVa).

309.    Williams OVM is the current owner and operator of the Oak Grove Facility.

310.    The Oak Grove Facility, as initially constructed, commenced operation on or about May 28-29, 2014, and is an onshore natural gas processing plant located in Moundsville, West Virginia.

311.    Williams OVM's Oak Grove Facility contains or has contained the following process units during the times relevant to this Complaint: Inlet, Stabilizer 1, Stabilizer 2, De-ethanizer 1, De-ethanizer 2, Debutanizer 1, Debutanizer 2, and TXP-1 (the "Oak Grove Facility Process Units").

312.    The Debutanizer 1 and Debutanizer 2 process units were placed into service on approximately December 12, 2014.

313.    The Oak Grove Facility Process Units include valves, pumps, and connectors that are and have been in gas/vapor or light liquid service since startup (except as is further alleged in Paragraph 312).

314.    The Debutanizer 2 process unit was removed from gas/vapor or light liquid service and decommissioned in November 2015.

315.    Although the Debutanizer 1 process unit remained in gas/vapor or light liquid service after startup, Williams OVM and/or its agent did not conduct LDAR monitoring of the Debutanizer 1 process unit until November 2015.

316.    On July 28-30 2015, and May 10, 2016 the EPA conducted a CAA inspection of Williams OVM's Oak Grove Facility.

317.    The Oak Grove Facility Process Units are "process units" and "affected facilities" within the meaning of NSPS Subpart OOOO.

318.    Williams OVM's Oak Grove Facility is a "new source" within the meaning of the CAA. 42 U.S.C. § 7411(a)(2).

319.     Williams OVM's Oak Grove Facility includes a building, structure, facility, or installation which emits or may emit any air pollutant. Therefore, the Oak Grove Facility is a "stationary source" within the meaning of the CAA. 42 U.S.C. §§ 7411(a)(3), 7602(z).

320.     Williams OVM's Oak Grove Facility is subject to the CAA requirements at 40 C.F.R. Part 60, Subpart OOOO, and those requirements of NSPS Subpart VVa that are referenced in NSPS Subpart OOOO.

## M.     Fort Beeler Facility

321.     The Fort Beeler Facility is an onshore natural gas processing plant located at 12681 Waynesburg Pike Road, Cameron, West Virginia.

322.     The Fort Beeler Facility is a cryogenic natural gas processing plant at which natural gas pumped via pipeline from well sites to Fort Beeler refined by being cooled to sub-zero temperatures in order to condense NGL including butane, ethane and pentanes which are sent via pipeline to the Moundsville Facility's fractionator for further processing. The remaining natural gas stream is further processed, including by an on-site de-ethanizer which removes the ethane from the gas stream. The resultant methane and ethane streams are then pumped to an interstate pipeline in various configurations to be sent to market as natural gas.

## N.     Echo Springs Facility

323.     The Echo Springs Facility is located at Section 1, Township 19 North, Range 93 West, Carbon County, Wyoming, approximately 8 miles southeast of Wamsutter, Sweetwater County, Wyoming.

324.     The Echo Springs Facility is a sweet gas processing plant that produces pipeline quality natural gas and natural gas liquids (NGL) through a cryogenic turbo expansion process. The facility consists of four turbo expander plants (TXP1, TXP2, TXP3, and TXP4) for a nominal

combined inlet gas capacity of 730 MM SCFD. The natural gas liquids, methane and ethane products are solid via pipelines.

325. The Echo Springs Facility contains affected facilities as described in 40 C.F.R. § 60.5365a(f).

326. The State of Wyoming Department of Environmental Quality Air Quality Division issued Permit Number P0027858 ("Echo Springs Permit") to the Echo Springs Gas Plant on November 23, 2020.

327. The Echo Springs Plant Permit requires compliance with applicable requirements of 40 C.F.R. Part 60, Subparts A, OOOO, and OOOOa (and by reference NSPS Subpart VVa) and 40 C.F.R. Part 63, Subparts A and HH.

## O.    Opal Facility

328. The Opal Facility is located at Sections 22 & 27, Township 21 North, Range 114 West, Lincoln County, Wyoming, approximately one mile west of Opal, Wyoming.

329. The Opal Facility receives natural gas from the Green River Gathering Area, which accepts gas from numerous independent producers. There are five natural gas liquids extraction plants at the facility: TXP1, TXP2, TXP3, TXP4 and TXP5. TXP-1 was constructed in 1984, TXP-2 in 1993, TXP-3 in 1999, TXP4 in 2004 and TXP5 in 2007. A 1.0 billion cubic feet per day (Bscfd) dehydration facility was completed in 2004 and expanded to 1.35 billion cubic feet in December of 2012. Any condensate present at the plant inlet is removed prior to the extraction processes. In each plant, the natural gas liquids are separated using distillation towers and other processes into discrete ethane, propane, and butane fractions and sold as liquid products via pipeline, truck, and railcar. The residual natural gas is recompressed to mainline pressure prior to leaving the facility.

330.     The Opal Facility contains affected facilities as described in 40 C.F.R. § 60.5365a(f).

331.     The State of Wyoming Department of Environmental Quality Air Quality Division issued Permit Number P0021921 ("Opal Facility Permit") to the Opal Gas Plant on May 9, 2022.

332.     The Opal Facility Permit requires compliance with applicable requirements of 40 C.F.R. Part 60, Subparts A, KKK, OOOO, and OOOOa (and by reference NSPS Subpart VVa) and 40 C.F.R. Part 63, Subparts A and HH.

## FIRST CLAIM FOR RELIEF
### NSPS Subpart KKK - Failure to Conduct Timely Monitoring
**(Ignacio Facility)**

333.     Paragraphs 1 through 332 are realleged and incorporated by reference as if fully set forth within.

334.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to monitor each pump in light liquid service on a monthly basis to detect leaks. 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-2(a)(1).

335.     During the second quarter of 2014, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to conduct monthly monitoring of 19 NSPS Subpart KKK pumps (specifically, 10 pumps in the Storage & Loading process unit, 3 pumps in the Inlet process unit, and 6 pumps in the TXP process unit).

336.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to monitor each valve that began operation in gas/vapor service or light liquid service

after the initial startup date for the process unit within 30 days of the end of the valve's startup period. 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-7(a)(2)(i).

337.    In April of 2014, Defendants Williams Companies and Harvest (as successor to Williams FC) installed 160 new valves in the Inlet process unit but failed to monitor those newly installed valves within 30 days of the end of the valve's startup period.

338.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to monitor each valve monthly to detect leaks until the valve did not leak for two successive months. 40 C.F.R. §§ 60.632(a), 60.482-7(a)(1) & 60.482-7(c)(1)(i).

339.    After installing one new valve in the Inlet process unit in October of 2013, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to monitor that newly-installed valve monthly until no leak was detected for two successive months.

340.    After installing three new valves in the TXP process unit in March of 2014, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to monitor those newly-installed valves monthly until no leak was detected for two successive months.

341.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to monitor each valve in gas/vapor or light liquid service quarterly. 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-7(c)(1)(i).

342.    Between the third quarter of 2013 and the first quarter of 2014, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to monitor two valves in the Inlet process unit on a quarterly basis on three occasions. With certain exceptions and alternatives not relevant here, NSPS Subpart KKK required Defendants Williams Companies and

Harvest (as successor to Williams FC) to monitor each valve in gas/vapor or light liquid service on a monthly basis following the detection of a leak until no leak was detected for two successive months. 40 C.F.R. §§ 60.632(a) and 60.482-7(a)(1).

343.    Following the detection of leaks at two valves in gas/vapor or light liquid service in the TXP process unit in February of 2014, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to monitor those valves monthly until the valves did not leak for two successive months.

344.    Therefore, Defendants Williams Companies and Harvest (as successor to Williams FC) violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.632(a) (and by reference 40 C.F.R. §§ 60.482-2(a)(1), 60.482-7(a)(2)(i), 60.482-7(a)(1), and 60.482-7(c)(1)(i))

345.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as successor to Williams FC) to injunctive relief and civil penalties for each day that each violation continued.

### SECOND CLAIM FOR RELIEF
### NSPS Subpart KKK - Failure to Repair Leaking Pump within Fifteen Days
### (Ignacio Facility)

346.    Paragraphs 1 through 345 are realleged and incorporated by reference as if fully set forth within.

347.    With certain exceptions not relevant here, pursuant to NSPS Subpart KKK Defendants Williams Companies and Harvest (as successor to Williams FC) were required to repair a leak detected at a pump in gas/vapor or light liquid service as soon as practicable but no later than fifteen calendar days from the date the leak was detected. 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-2(c)(1).

348.    After detecting a leak on August 28, 2015 at one NSPS Subpart KKK pump in the Storage and Loading process unit, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to repair the leak until September 21, 2015.

349.    Therefore, Defendants Williams Companies and Harvest (as successor to Williams FC) violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.632(a) (and by reference 40 C.F.R. § 60.482-2(c)(1)).

350.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as successor to Williams FC) to injunctive relief and civil penalties for each day that each violation continued.

**THIRD CLAIM FOR RELIEF**
**NSPS Subpart KKK - Failure to Identify Equipment**
**(Ignacio Facility)**

351.    Paragraphs 1 through 350 are realleged and incorporated by reference as if fully set forth within.

352.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to identify equipment subject to NSPS Subpart KKK.  40 C.F.R. § 60.632(e) and 40 C.F.R. § 60.486(e).

353.    Based on the Ignacio Facility's LDAR monitoring data and a component inventory submitted in March 2017, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to identify applicability of NSPS Subpart KKK to 2 pressure relief devices, 2 pumps, and 71 valves in the Storage and Loading process unit prior to 2012.

354.     Based on the Ignacio Facility's LDAR monitoring data and a component inventory submitted in March 2017, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to identify applicability of NSPS Subpart KKK to 32 pressure relief devices, 3 pumps, and 593 valves in the Storage and Loading process unit prior to 2015.

355.     Based on the Ignacio Facility's LDAR monitoring data and a component inventory submitted in March 2017, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to identify applicability of NSPS Subpart KKK to 1 pump and 7 valves in the TXP process unit prior to 2012.

356.     Based on LDAR monitoring data and a component inventory submitted in March 2017, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to identify applicability of NSPS Subpart KKK to 3 pressure relief devices, 2 pumps, and 166 valves in the TXP process unit prior to 2015.

357.     Because Defendants Williams Companies and Harvest (as successor to Williams FC) failed to include these 882 total pieces of equipment in its NSPS Subpart KKK LDAR program, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to comply with the monitoring, repair, record-keeping, and reporting requirements of NSPS Subpart KKK.

358.     Therefore, Defendant Williams Companies, Inc. violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.632(e) (and by reference 40 C.F.R. § 60.486(e)), as well as 40 C.F.R. §§ 60.632 (and by reference 40 C.F.R. §§ 60.482-1(a), (b), and (d) and 60.482-2 through 60.482-10), 60.635, and 60.636.

359.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as

successor to Williams FC) to liability to the United States for injunctive relief and civil penalties for each day that each violation continued.

## FOURTH CLAIM FOR RELIEF
### NSPS Subpart OOOO – Failure to Conduct Timely Repairs
**(Ignacio Facility)**

360.     Paragraphs 1 through 359 are realleged and incorporated by reference as if fully set forth within.

361.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to make a first attempt at repair of a leaking valve in gas/vapor or light liquid service within five calendar days of the date the leak was detected. 40 C.F.R. § 60.5400(a) and 40 C.F.R. § 60.482-7a(d)(2).

362.     In August of 2015, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to perform a first attempt at repair no later than five days after each leak was detected at two valves in the Inlet process unit.

363.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to repair a leak detected at a valve in gas/vapor or light liquid service as soon as practicable but no later than fifteen calendar days from the date the leak was detected. 40 C.F.R. § 5400(a) and 40 C.F.R. § 60.482-7a(d)(1).

364.     In August of 2015, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to repair leaks at two valves in the Inlet process unit as soon as practicable, but no later than fifteen calendar days after the leak was detected, or to place the equipment on delay of repair.

365.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to repair a leak detected at a connector in gas/vapor or light liquid service as soon as practicable but no later than fifteen calendar days from the date the leak was detected. 40 C.F.R. §§ 60.5400(a) and 60.482-11a(d)

366.     In October of 2015, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to repair a leak at one connector in the Inlet process unit as soon as practicable, but no later than fifteen calendar days after the leak was detected, or to place the equipment on delay of repair.

367.     Therefore, Defendants Williams Companies and Harvest (as successor to Williams FC) violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. §§ 60.482-7a(d)(2), and 60.482-7a(d)(1), and 60.482-11a(d)).

368.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as successor to Williams FC) to injunctive relief and civil penalties for each day that each violation continued.

### FIFTH CLAIM FOR RELIEF
### NSPS Subpart OOOO - Failure to Conduct Monthly Monitoring on Leaking Valves
#### (Ignacio Facility)

369.     Paragraphs 1 through 368 are realleged and incorporated by reference as if fully set forth within.

370.     With certain exceptions and alternatives not relevant here, NSPS Subpart OOOO required Defendants Williams Companies and Harvest (as successor to Williams FC) to monitor each valve in gas/vapor or light liquid service on a monthly basis following the detection of a leak

until no leak was detected for two successive months. 40 C.F.R. § 60.5400(a) and 40 C.F.R. § 60.482-7a(c)(2).

371.    Following the detection of leaks at two valves in gas/vapor or light liquid service in the Inlet process unit in August of 2015, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to monitor those valves monthly until no leak was detected for two successive months.

372.    Therefore, Defendants Williams Companies and Harvest (as successor to Williams FC) violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. § 60.482-7a(c)(2)).

373.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as successor to Williams FC) to injunctive relief and civil penalties for each day that each violation continued.

**SIXTH CLAIM FOR RELIEF**
**<u>NSPS Subpart KKKK – Failure to Report Performance Testing Results</u>**
**(Ignacio Facility)**

374.    Paragraphs 1 through 373 are realleged and incorporated by reference as if fully set forth within.

375.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKKK, Defendant Harvest was required to report performance testing results on Turbine emission units 27, 28, 29, 30, and 31 within sixty days of the testing. 40 C.F.R. § 60.4375.

376.    Harvest failed to submit to the Tribe the results of a performance test within sixty days of completion of the testing, as required by 40 C.F.R. §60.4375 of NSPS Subpart KKKK.

377.     Therefore, Defendant Harvest violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.4375.

378.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Harvest to injunctive relief and civil penalties for each day that each violation continued.

**SEVENTH CLAIM FOR RELIEF**
**NESHAP Subpart HH - Failure to Identify Equipment**
**(Ignacio Facility)**

379.     Paragraphs 1 through 378 are realleged and incorporated by reference as if fully set forth within.

380.     With certain exceptions and alternatives not relevant here, pursuant to NESHAP Subpart HH, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to identify equipment such as pumps and valves subject to NESHAP Subpart HH.  40 C.F.R. § 63.769(c) (and by reference, 40 C.F.R. § 61.246(e)(1)). Such equipment is then subject to additional requirements for monitoring for leaks of air pollutants, repairing leaks, recordkeeping, and reporting to regulators. 40 C.F.R. §§ 63.764, 63.769, 63.774, and 63.775.

381.     Between October 15, 2013 and December 31, 2014, Defendants Williams Companies and Harvest (as successor to Williams FC) failed to identify applicability of NESHAP Subpart HH to 560 valves and 7 pumps at the Ignacio Facility, resulting in missed monitoring, missed repairs, missed recordkeeping, and missed reporting.

382.     Therefore, Defendants Williams Companies and Harvest (as successor to Williams FC) violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. §§ 63.764, 63.769, 63.774, and 63.775.

383.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as successor to Williams FC) to injunctive relief and civil penalties for each day that each violation continued.

## EIGHTH CLAIM FOR RELIEF
### NESHAP Subpart HH - Failure to Prepare Site-Specific Monitoring Plan
### (Ignacio Facility)

384.     Paragraphs 1 through 383 are realleged and incorporated by reference as if fully set forth within.

385.     Under 40 C.F.R. 63.773(d)(1)(ii), Harvest was required to have a site-specific monitoring plan which includes all the elements required by 63.773(d)(1)(ii) of NESHAP Subpart HH, and by reference 40 C.F.R. §§63.8(d) of Part 63, Subpart A.

386.     Harvest failed to prepare a site-specific monitoring plan which includes all required elements, as required by §63.773(d)(1)(ii) of NESHAP Subpart HH and by reference 40 C.F.R. §63.8(d) of NESHAP Subpart A.

387.     Therefore, Defendant Harvest violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. §63.773(d)(1)(ii) (and by reference 40 C.F.R. §§63.8(d)).

388.     As provided in in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Harvest to injunctive relief and civil penalties for each day that each violation continued.

## NINTH CLAIM FOR RELIEF
### NESHAP Subpart HH – Failure to Submit Semi-Annual Period Reports
### (Ignacio Facility)

389.     Paragraphs 1 through 388 are realleged and incorporated by reference as if fully set forth within.

390.     Pursuant to 40 C.F.R. §§63.775(b)(5) and 63.775(e)(2) of NESHAP Subpart HH, Harvest was required to submit semi-annual periodic reports.

391.     Harvest failed to submit the required semi-annual periodic reports for the periods January 1 through June 30, 2018, and July 1 through December 31, 2018.

392.     Therefore, Defendant Harvest violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. §§63.775(b)(5) and 63.775(e)(2).

393.     As provided in Section 113(b) of the CAA and 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Harvest to injunctive relief and civil penalties for each day that each violation continued.

**TENTH CLAIM FOR RELIEF**
**NESHAP Subpart HH – Failure to Provide Notification of Intent to Conduct Performance Testing**
**(Ignacio Facility)**

394.     Paragraphs 1 through 393 as if fully set forth within are realleged and incorporated by reference as if fully set forth within.

395.     Pursuant to §§ 63.775(b)(5) and 63.775(e)(2) of NESHAP Subpart HH, Harvest was required to provide at least sixty days' notice to the Tribe of Harvest's intent to conduct performance evaluations on emission unit 22, a thermal oxidizer.

396.     Harvest failed to provide the Tribe a notification of intent to conduct performance evaluations at least sixty days before the performance evaluation was conducted.

397.     Therefore, Defendant Harvest violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. §§ 63.775(b)(5) and 63.775(e)(2).

398.     As provided in Section 113(b) of the CAA and 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Harvest to injunctive relief and civil penalties for each day that each violation continued.

**ELEVENTH CLAIM FOR RELIEF**
**PSD and Title V Permits - Failure to Comply With Thermal Oxidizer Emission Limits**
**(Ignacio Facility)**

399.    Paragraphs 1 through 398 are realleged and incorporated by reference as if fully set forth within.

400.    Under the terms of the December 22, 2010 PSD Permit and the January 28, 2013 Title V Permit, Defendants Williams Companies and Harvest (as successor to Williams FC) were required to limit VOC emissions from the thermal oxidizer to 1.16 lbs/hour and 5.1 tons/year when both the Amine Treatment and East Dehydrator were operating. PSD Permit § III.G.1 and Title V Permit § VIII.F.1.

401.    Testing performed on August 20 and 21, 2015, showed that the thermal oxidizer was emitting at 1.18 lbs per hour of VOC and 5.2 tons per year of VOC when both the Amine Treatment and East Dehydrator were operating. In its September 21, 2016 Title V semi-annual report, Williams FC reported that emissions from the thermal oxidizer were within permitted limits on July 28, 2016.

402.    Emissions from the thermal oxidizer exceeded the hourly emissions limit on 341 separate days when both the Amine Treatment and East Dehydrator were operating.

403.    Therefore, Defendants Williams Companies and Harvest (as successor to Williams FC) violated Section III.G.1 of the December 22, 2010 PSD permit and Section VIII.F.1 of the January 28, 2013 Title V permit, and in turn 40 C.F.R. § 52.23 and Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

404.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Harvest (as

successor to Williams FC) to injunctive relief and civil penalties for each day that each violation continued.

**TWELFTH CLAIM FOR RELIEF**
**<u>PSD and Title V Permits</u>**
**<u>Failure to Operate Flare Consistent with Good Air Pollution Control Practices</u>**
**(Ignacio Facility)**

405.     Paragraphs 1 through 404 are realleged and incorporated by reference as if fully set forth within.

406.     Under the terms of the December 22, 2010 PSD Permit and the various Title V permits, Defendants Williams Companies, Inc. and Harvest were required to maintain and operate the West Dehydrator and its control device (the flare) in a manner consistent with good air pollution control practice for minimizing emissions. PSD Permit § III.F.6; January 28, 2013 Federal Title V Permit § VIII.E.6; June 5, 2017 Tribal Title V Permit § 4.4.6; December 7, 2018 Tribal Title V Permit § 4.4.6.

407.     On June 22, 2016, using an optical gas imaging camera, EPA inspectors observed un-combusted hydrocarbons being emitted from the flare.

408.     Harvest has acknowledged that the flare has been over-steamed on occasion (including the June 22, 2016 incident).

409.     Williams Companies and/or Harvest have failed to maintain the steam control system in a manner to assure proper steam-to-flare gas ratios and prevent over-steaming of the flare.

410.     Because the flare has been over-steamed and emitted uncombusted hydrocarbons, Defendants Williams Companies, Inc. and Harvest failed to maintain and operate the West Dehydrator and its control device (the flare) in a manner consistent with good air pollution control practice for minimizing emissions.

411.    Therefore, Defendants Williams Companies, Inc. and Harvest violated Section III.F.6 of the December 22, 2010, PSD Permit Number PSD-SU-00027-01.00, Section VIII.E.6 of the January 28, 2013, Title V Permit Number V-SU-000027-2008.00, Section 4.4.6 of the June 5, 2017 Tribal Title V Permit (Permit Number V-SUIT-0027-2017.00), and Section 4.4.6 of the December 7, 2018 Tribal Title V Permit (Permit Number V-SUIT-0027-2017.01), and in turn 40 C.F.R. § 52.23 and Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

412.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Williams Companies, Inc. and Harvest to injunctive relief and civil penalties for each day that each violation continued.

### THIRTEENTH CLAIM FOR RELIEF
### NSPS & NESHAP Subparts A – Failure to Comply with Control Device and Work Practice Requirements
### (Ignacio Facility)

413.    Paragraphs 1 through 412 are realleged and incorporated by reference as if fully set forth within.

414.    With certain exceptions and alternatives not relevant here, pursuant to NSPS and NESHAP Subparts A, Williams Companies, Inc. and Harvest were required to calculate the NHV of the flare vent gas stream using the specific equation set forth in 40 C.F.R. §§ 60.18(f)(3) and 63.11(b)(6)(ii).

415.    As discussed in Paragraph 215, Harvest admitted that it had not properly calculated the NHV of the flare vent gas stream until at least January 31, 2020.

416.    Therefore, Williams Companies, Inc. and Harvest violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. §§ 60.18(f)(3) and 63.11(b)(6).

417.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Williams Companies, Inc. and Harvest to injunctive relief and civil penalties for each day that each violation continued.

## FOURTEENTH CLAIM FOR RELIEF
### PSD and Title V Permits – Failure to Report Performance Testing Results
(Ignacio Facility)

418.     Paragraphs 1 through 417 are realleged and incorporated by reference as if fully set forth within.

419.     Under the terms of the December 22, 2010 PSD permit and the Tribe's 2018 Title V Permit, Defendant Harvest was required to report performance testing results on emission unit 22, a thermal oxidizer, within forty-five days after completion of the test on May 7, 2019.

420.     Harvest failed to submit to the Tribe the results of a performance test within forty-five days of completion of the testing, as required by Section III.C.6. of the December 22, 2010 PSD permit and Section III.4.5.4.4 of the Tribe's 2018 Title V Permit.

421.     Therefore, Defendant Harvest violated Section III.C.6. of the December 22, 2010 PSD permit and Section III.4.5.4.4 of the Tribe's 2018 Title V Permit, and in turn 40 C.F.R. § 52.23, and Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

422.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Harvest to injunctive relief and civil penalties for each day that each violation continued.

## FIFTEENTH CLAIM FOR RELIEF
### Title V Permit – Failure to Report Deviations in Annual Compliance Certification Report
(Ignacio Facility)

423.     Paragraphs 1 through 422 are realleged and incorporated by reference as if fully set forth within.

424.     Under Section II.1.2.2.1 of the Tribe's 2018 Title V Permit, Harvest was required to report deviations in an annual compliance certification report.

425.     Harvest failed to report as deviations in an annual compliance certification report for the compliance reporting period of January 1 through December 31, 2017, January 1 through December 31, 2018, and January 1 through January 2019, the following: (a) Failure to prepare a site-specific monitoring plan which includes all required elements, as required by NESHAP Subpart HH; (b) Failure to submit a periodic report, as required by NESHAP Subpart HH; (c) Failure to submit the results of a stack test within forty-five days after completion of the test, as required by a Prevention of Significant Deterioration permit, (d) Failure to submit the results of turbine performance test within sixty-days of completion, and (e) Failure to provide contemporaneous notice of turbine exchanges.

426.     Therefore, Defendant Harvest violated II.1.2.2.1 of the Tribe's 2018 Title V Permit and in turn Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

427.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Harvest to injunctive relief and civil penalties for each day that each violation continued.

## SIXTEENTH CLAIM FOR RELIEF
### Title V Permit – Failure to Maintain Adequate Records
### (Ignacio Facility)

428.     Paragraphs 1 through 427 are realleged and incorporated by reference as if fully set forth within.

429.     Harvest failed to provide the Tribe contemporaneous notice and maintain records of a turbine exchange, as required by permit provisions II.1.15, II.2.1.2, and II.2.3 of the Tribe's 2018 Title V Permit.

430.     Therefore, Defendant Harvest violated permit provisions II.1.15, II.2.1.2, and II.2.3 of the Tribe's 2018 Title V Permit, and in turn Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

431.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Harvest to injunctive relief and civil penalties for each day that each violation continued.

**SEVENTEENTH CLAIM FOR RELIEF**
**NSPS Subpart KKK - Failure to Conduct Timely Monitoring**
**(Mobile Bay Facility)**

432.     Paragraphs 1 through 431 are realleged and incorporated by reference as if fully set forth within.

433.     With certain exceptions not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies, Inc. and Williams MBPS were required to monitor each valve in gas and vapor service and in light liquid service monthly to detect leaks by the methods specified in § 60.485(b), except that Defendants could elect to comply with one of the alternative work practices option provided in § 60.483-2 (Alternative Standards for valves - Skip Period Leak Detection and Repair).   40 C.F.R. §§ 60.485(b) and 60.482-7(a)(1). Defendants Williams Companies, Inc. and Williams MBPS elected to implement the skip period leak detection and repair alternative, which requires the valves to be monitored semi-annually in lieu of monthly.

434.     NSPS Subpart KKK further requires that each closed vent system shall be monitored annually for visible, audible, or olfactory indications of leaks. 40 C.F.R. § 60.482-10(f)(1)(ii).

435.     EPA reviewed the Mobile Bay Facility's electronic LDAR database and determined that between September 20, 2013, and December 31, 2018, the Facility failed to conduct

inspections on at least 694 components including valves, pumps, closed vent systems, one compressor, and pressure relief devices.

436.    Therefore, Defendants Williams Companies, Inc. and Williams MBPS violated 40 C.F.R. §§ 60.482-7, 60.482-2, 60.482-10, 60.482-3, and 60.633(b).

437.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies, Inc. and Williams MBPS to injunctive relief and civil penalties for each day that each violation continued.

**EIGHTEENTH CLAIM FOR RELIEF**
**<u>NSPS Subparts KKK - Failure to Properly Conduct Method 21 Monitoring</u>**
**(Mobile Bay Facility)**

438.    Paragraphs 1 through 437 are realleged and incorporated by reference as if fully set forth within.

439.    With certain exceptions not relevant here, pursuant to NSPS Subpart KKK, Defendants Williams Companies, Inc. and Williams MBPS were required to use Method 21 testing procedures to determine the presence of VOC leaks from components in process units, including, but not limited to, valves, flanges, pumps, compressors, and pressure relief devices, in accordance with the requirements in 40 C.F.R. § 60.484(a) (Appendix A-7).  40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.485(b).

440.    Method 21 requires the LDAR technician to take specific steps to properly and accurately monitor components. 40 C.F.R. Part 60, Appendix A-7 (Section 8.3.1- EPA Method 21).

441.    Therefore, Defendants Williams Companies, Inc. and Williams MBPS failed to properly conduct Method 21 test procedures to monitor at least 1,641 components from October 2014 through October 2015, in violation of 40 C.F.R. §§ 60.632(d), 60.483-2, and 60.485(b).

442. As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies, Inc. and Williams MBPS to injunctive relief and civil penalties for each day that each violation continued.

**NINETEENTH CLAIM FOR RELIEF**
**NSPS Subpart KKK - Failure to Make Timely Repairs**
**and Document Delay of Repair in Semi-Annual Reports**
**(Mobile Bay Facility)**

443. Paragraphs 1 through 442 are realleged and incorporated by reference as if fully set forth within.

444. With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendant Williams MBPS was required to make a first attempt at repair of a leaking valve in gas/vapor or light liquid service within five calendar days of the date the leak was detected in accordance with the requirements at 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-7(d)(2).

445. With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Williams Companies, Inc. and Williams MBPS were required to repair a leak detected at a valve in gas/vapor or light liquid service as soon as practicable but no later than fifteen calendar days from the date the leak was detected, in accordance with the requirements at 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-7(d)(1).

446. 40 C.F.R. § 60.482-9(a) states a delay of repair of equipment for which leaks have been detected will be allowed if repair within 15 days is technically infeasible without a process unit shutdown. Repair of this equipment shall occur before the end of the next process unit shutdown. Monitoring to verify repair must occur within 15 days after start-up of the process unit.

447. 40 C.F.R. § 60.487(a) states each owner or operator subject to the provisions of this subpart is required to submit semiannual reports to the Administrator beginning six months after

the initial start-up date, to include the facts that explain each delay of repair and why a repair was technically infeasible without a process unit shutdown in accordance with the requirements at 40 C.F.R. § 60.487(c)(vii).

448.     Defendants Williams Companies, Inc. and Williams MBPS failed to make first attempts at repair within the requisite five (5) days, and final repair within 15 days for at least two valves, and also failed to include and document requisite delay of repair information in the semi-annual report, in violation of 40 C.F.R. §§ 60.487(c)(vii); 60.482-7(d)(2); and 60.482-7(d)(1).

449.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies, Inc. and Williams MBPS to injunctive relief and civil penalties for each day that each violation continued.

### TWENTIETH CLAIM FOR RELIEF
### NSPS Subpart OOOOa - Failure to Provide Notice of Start-up of Construction, Modification or Reconstruction
### (Mobile Bay Facility)

450.     Paragraphs 1 through 449 are realleged and incorporated by reference as if fully set forth within.

451.     40 C.F.R. §§ 60.7(a)(3) and 60.5420a(a)(1) state an owner and operator of an affected facility is required to submit a notification of the actual date of the initial start-up of an affected facility postmarked within 15 days after such date.

452.     40 C.F.R. § 60.2 defines "start-up" as "setting in operation of an affected facility for any purpose."

453.     On December 4, 2017, Defendants Williams Companies, Inc. and Williams MBPS initiated start-up of the modification at the NGL extraction process unit and failed to submit a notification to EPA until over five months after the initial start-up date, in violation of 40 C.F.R. §§ 60.7(a)(3) and 60.5420a(a).

454.   As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies, Inc. and Williams MBPS to injunctive relief and civil penalties for each day that each violation continued.

### TWENTY-FIRST CLAIM FOR RELIEF
### Title V Permit - Failure to Meet Permit Requirements
### (Mobile Bay Facility)

455.   Paragraphs 1 through 454 are realleged and incorporated by reference as if fully set forth within.

456.   Sections 501 through 507 of the CAA, 42 U.S.C. §§ 7661a through 7661f, require state and local authorities to develop a Title V program and submit it to the EPA for approval. Alabama's EPA-approved Title V program became effective on December 28, 1993 (61 Fed. Reg. 18966).

457.   Section 504(a) of the CAA requires Title V permits to include all applicable emission limitations and standards of the Act for each major source.

458.   Section 502(a) of the CAA, 42 U.S.C. § 7661a(a) states that it is unlawful for any person to violate any requirement of a permit issued under the Title V permit program.

459.   The Mobile Bay Facility's Title V permit in effect at the relevant time included federally-enforceable provisions requiring compliance with 40 C.F.R. Part 60, Subpart KKK.

460.   Therefore, each occasion that Defendants Williams Companies and Williams MBPS violated NSPS KKK, they were also in violation of the Title V permit requirements at 42 U.S.C. § 7661a(a) and Ala. Admin. Code r 335-3-16-07.

461.   As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Williams Companies and Williams MBPS to injunctive relief and civil penalties for each day that each violation continued.

## TWENTY-SECOND CLAIM FOR RELIEF
### NSPS Subpart KKK - Failure to Repair a Leaking Valve within Fifteen Days
### (Parachute Creek Facility)

462.　Paragraphs 1 through 461 are realleged and incorporated by reference as if fully set forth within.

463.　With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Bargath and Williams Companies, Inc. were required to repair a detected leak at a leaking valve in gas/vapor or light liquid service as soon as practicable but no later than fifteen calendar days from the date the leak was detected. 40 C.F.R. § 60.632(a) and 40 C.F.R. § 60.482-7(d)(1); and 5 Colo. Code Regs. § 1001-8:A.

464.　Between at least December 2012 and September 2016, Defendants Bargath and Williams Companies, Inc. failed to repair two leaking valves in gas/vapor or light liquid service located in NSPS Subpart KKK process units at Plant 2 and Plant 3.5 within fifteen calendar days of the date the leak was detected.

465.　Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.632(a) (and by reference 40 C.F.R. § 60.482-7(d)(1)); and 5 Colo. Code Regs. § 1001-8:A.

466.　As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc. to injunctive relief and civil penalties for each day that each violation continued.

## TWENTY-THIRD CLAIM FOR RELIEF
### NSPS Subpart KKK - Failure to Conduct Timely Monitoring
### (Parachute Creek Facility)

467.　Paragraphs 1 through 466 are realleged and incorporated by reference as if fully set forth within.

468.    With certain exceptions and alternatives not relevant here, NSPS Subpart KKK required Defendants Bargath and Williams Companies, Inc. to monitor each valve monthly until the valve did not leak for two successive months. 40 C.F.R. §§ 60.632(a), 60.482-7(a)(1) & 60.482-7(c)(1)(i); and 5 Colo. Code Regs. § 1001-8:A.

469.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Bargath and Williams Companies, Inc. were required to monitor each valve in gas/vapor or light liquid service quarterly. 40 C.F.R. §§ 60.632(a) & 60.482-7(c)(1)(i); and 5 Colo. Code Regs. § 1001-8:A.

470.    Defendants Bargath and Williams Companies, Inc. installed 33 new valves in gas/vapor or light liquid service at various NSPS Subpart KKK process units (including 1 valve at Plant 1, 31 valves at Plant 2, and 1 valve at Plant 3.5) between March 2013 and March 2014 but failed to subsequently conduct monthly monitoring of those valves after startup.

471.    Between the third quarter of 2012 and the second quarter of 2016, Defendants Bargath and Williams Companies, Inc. failed to conduct quarterly monitoring of valves in 59 instances at various NSPS Subpart KKK process units located within Plant 2.

472.    Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.632(a) (and by reference 40 C.F.R. §§ 60.482-7(a)(1) & 60.482-7(c)(1)(i)); and 5 Colo. Code Regs. § 1001-8:A.

473.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc. to injunctive relief and civil penalties for each day that each violation continued.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**NSPS Subpart KKK - Failure to Identify Equipment**
**(Parachute Creek Facility)**

474.    Paragraphs 1 through 473 are realleged and incorporated by reference as if fully set forth within.

475.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Bargath and Williams Companies, Inc. were required to identify equipment subject to NSPS Subpart KKK.  40 C.F.R. §§ 60.632(e) & 60.486(e); and 5 Colo. Code Regs. § 1001-8:A.

476.    Based on Defendants Bargath and Williams Companies, Inc.'s LDAR monitoring data and a component inventory submitted in February 2016, Defendants Bargath and Williams Companies, Inc. failed to identify and include 887 pieces of equipment in various NSPS Subpart KKK process units in their LDAR program until the third quarter of 2016.

477.    Because they failed to include these 887 total pieces of equipment in their NSPS Subpart KKK LDAR program, Defendants Bargath and Williams Companies, Inc. failed to comply with the monitoring, repair, record-keeping, and reporting requirements of NSPS Subpart KKK.

478.    Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.632(e) (and by reference 40 C.F.R. § 60.486(e)), as well as 40 C.F.R. § 60.632 (and by reference §§ 60.482-1(a), (b) and (d) and § 60.482-2 through §§ 60.482-10), 60.635 & 60.636; and 5 Colo. Code Regs. § 1001-8:A.

479.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc.

to liability to the United States for injunctive relief and civil penalties for each day that each violation continued.

## TWENTY-FIFTH CLAIM FOR RELIEF
## NSPS Subpart KKK – Failure to Comply with Reporting Requirements
### (Parachute Creek Facility)

480.     Paragraphs 1 through 479 are realleged and incorporated by reference as if fully set forth within.

481.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart KKK, Defendants Bargath and Williams Companies, Inc. were required to submit semiannual reports to the Administrator that include the process unit identification, revisions to equipment inventory counts in the process unit if changes had occurred, the dates of process unit shutdowns which occurred within the semiannual reporting period, and, for each month during the semiannual reporting period, information on the number of leaks detected, the number leaks not repaired, and the facts regarding delay of repair for any unrepaired leaks in the process unit. 40 C.F.R. §§ 60.636 and 60.487(c).

482.     From July 2011 through January 2016, Defendants Bargath and Williams Companies, Inc. submitted semiannual reports that failed to include the process unit identifications; revisions to equipment inventory counts in the process unit; the dates of process unit shutdowns which occurred within the semiannual reporting period; and, for each month during the semiannual reporting period, information by process unit on the number of leaks detected, the number leaks not repaired, and the facts regarding delay of repair for any unrepaired leaks in the process unit.

483.     Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.636 (and by reference 40 C.F.R. § 60.487); and by incorporation 5 Colo. Code Regs. § 1001-8:A.

484.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc. to liability to the United States for injunctive relief and civil penalties for each day that each violation continued.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**NESHAP Subpart HH – Failure to Conduct Timely Repairs**
**(Parachute Creek Facility)**

485.     Paragraphs 1 through 484 are realleged and incorporated by reference as if fully set forth within.

486.     With certain exceptions and alternatives not relevant here, pursuant to NESHAP Subpart HH, Defendants Bargath and Williams Companies, Inc. were required to make a first attempt at repair of a leaking valve in wet gas service within five calendar days of the date the leak was detected. 40 C.F.R. § 63.769(c) and 40 C.F.R. § 61.242-7(d)(2); and 5 Colo. Code Regs. § 1001-10:E.

487.     With certain exceptions and alternatives not relevant here, pursuant to NESHAP Subpart HH, Defendants Bargath and Williams Companies, Inc. were required to repair leaking valves in wet gas service within fifteen calendar days of the date the leak was detected. 40 C.F.R. §§ 63.769(c) & 61.242-7(d)(1); and 5 Colo. Code Regs. § 1001-10:E.

488.     Between at least October 2013 and September 2016, Defendants Bargath and Williams Companies, Inc. failed to perform a first attempt at repair within five calendar days of the date the leak was detected at NESHAP Subpart HH valves in 256 instances.

489.     Between at least October 2012 and September 2016, Defendants Bargath and Williams Companies, Inc. failed to repair leaks within fifteen calendar days of the date the leak was detected at NESHAP Subpart HH valves in 279 instances.

490.     Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. § 63.769(c) (and by reference 40 C.F.R. §§ 61.242-7(d)(1) and 61.242-7(d)(2)); and by incorporation, and 5 Colo. Code Regs. § 1001-10:E.

491.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc. to injunctive relief and civil penalties for each day that each violation continued.

## TWENTY-SEVENTH CLAIM FOR RELIEF
## <u>NESHAP Subpart HH - Failure to Conduct Monthly Monitoring on Leaking Valves</u>
## (Parachute Creek Facility)

492.     Paragraphs 1 through 491 are realleged and incorporated by reference as if fully set forth within.

493.     With certain exceptions and alternatives not relevant here, NESHAP Subpart HH required Defendants Bargath and Williams Companies, Inc. to monitor each valve on a monthly basis following the detection of a leak until no leak was detected for two successive months. 40 C.F.R. §§ 63.769(c) and 40 C.F.R. § 61.242-7(c)(2); and 5 Colo. Code Regs. § 1001-10:E.

494.     Defendants Bargath and Williams Companies, Inc. failed to monitor leaks at valves on a monthly basis until no leak was detected for two successive months following the detection of leaks in 322 instances between at least October 2012 and September 2016.

495.     Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. § 63.769(c) (and by reference 40 C.F.R. § 61.242-7(c)(2)); and by incorporation, and 5 Colo. Code Regs. § 1001-10:E.

496.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc. to injunctive relief and civil penalties for each day that each violation continued.

### TWENTY-EIGHTH CLAIM FOR RELIEF
### NESHAP Subpart HH – Failure to Comply with Recordkeeping and Reporting Requirements for Leaking Valves
### (Parachute Creek Facility)

497.     Paragraphs 1 through 496 are realleged and incorporated by reference as if fully set forth within.

498.     With certain exceptions and alternatives not relevant here, pursuant to NESHAP Subpart HH, Defendants Bargath and Williams Companies, Inc. were required to comply with various recordkeeping and reporting requirements when a leak is detected.  40 C.F.R. §§ 63.769(c), 61.246, and 61.247; and 5 Colo. Code Regs. § 1001-10:E.

499.     Following the detection of leaks at valves between at least October 2012 and September 2016, Defendants Bargath and Williams Companies, Inc. failed to perform required recordkeeping and reporting for leaks at NESHAP Subpart HH valves in 322 instances.

500.     Therefore, Defendants Bargath and Williams Companies, Inc. violated Section 112(f) of the CAA, 42 U.S.C. § 7412(f), and 40 C.F.R. § 63.769(c) (and by reference 40 C.F.R. §§ 61.246 and 61.247); and by incorporation, and 5 Colo. Code Regs. § 1001-10:E.

501.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants Bargath and Williams Companies, Inc. to injunctive relief and civil penalties for each day that each violation continued.

## TWENTY-NINTH CLAIM FOR RELIEF
## NSPS Subpart OOOOa - Failure to Comply with Startup-Related Requirements
### (Conway Facility)

502.     Paragraphs 1 through 501 are realleged and incorporated by reference as if fully set forth within.

503.     NSPS Subpart OOOOa requires that an owner and operator of an affected facility submit a notification postmarked 60 days or as soon as practicable before a physical or operational change to an existing facility which may increase the emission rate of any air pollutant to which the standard applies. 40 C.F.R. §§ 60.7(a)(4) and 60.5420a(a)(1). The notification must contain information of the precise nature of the change, present and proposed emission control systems, productive capacity of the facility before and after the change, and the expected completion date of the change.

504.     On November 8, 2015, Defendant Mid-Continent initiated Phase 1 of the PSV project. On April 11, 2016, Defendant Mid-Continent initiated Phase 2 of the PSV project.

505.     On April 18, 2018, Defendant Mid-Continent submitted a notification, purporting to satisfy the requirements of 40 C.F.R. § 60.5420a and 40 C.F.R. § 60.7(a)(4), to EPA that a pressure safety valve project (PSV project) was a capital expenditure that increased the emission rate from the facility and therefore caused the Conway Facility to be subject to NSPS Subpart OOOOa. The letter indicated that the project would be complete on April 20, 2018.

506.     Defendant Mid-Continent failed to submit a notification to EPA postmarked at least 60 days or as soon as practicable before a physical or operational change was commenced at the facility that increased the emission rate of any pollutant to which NSPS Subpart OOOOa applies, in violation of 40 C.F.R. § 60.5420a and 40 C.F.R. § 60.7(a)(4).

507.    Defendant Mid-Continent failed to submit a notification to EPA for the PSV project that contains information of the precise nature of the change, present and proposed emission control systems, and the productive capacity of the facility before and after the change, in violation of 40 C.F.R. § 60.5420a and 40 C.F.R. § 60.7(a)(4).

508.    NSPS Subpart OOOOa requires owners and operators to demonstrate initial compliance with NSPS Subpart OOOOa requirements for equipment leaks at onshore natural gas processing plants by demonstrating compliance with the requirements of 40 C.F.R. § 60.5400a. 40 C.F.R. §60.5410a(f).

509.    NSPS Subpart OOOOa requires owners and operators to comply with the requirements of 40 C.F.R. §§ 60.482-1a(a), (b), (d), and (e), 60.482-2a, and 60.482-4a through 60.482-11a, except as provided in § 60.5401a, as soon as practicable but no later than 180 days after the initial startup of the process unit. 40 C.F.R. § 60.5400a.

510.    Defendant Mid-Continent did not conduct the LDAR monitoring required by 40 C.F.R. § 60.5400a until May 31, 2018, which was more than 180 days after the initial startup of the process unit.

511.    Defendant Mid-Continent did not demonstrate compliance with the requirements of 40 C.F.R. § 60.5400a until May 31, 2018.

512.    Therefore, Defendant Mid-Continent violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. §§ 60.5400a, 60.5420a.

513.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Mid-Continent to injunctive relief and civil penalties for each day that each violation continued.

## THIRTIETH CLAIM FOR RELIEF
### NSPS Subpart OOOOa - Failure to Submit Timely Reports
### (Conway Facility)

514. Paragraphs 1 through 513 are realleged and incorporated by reference as if fully set forth within.

515. NSPS Subpart OOOOa requires owners and operators to submit an initial annual report within 90 days after the end of the initial compliance period. 40 C.F.R. § 60.5420a. The initial compliance period begins on the date of initial startup and ends no later than 1 year after the initial startup date of the affected facility. Subsequent annual reports are due no later than same date each year as the initial annual report. *Id*.

516. NSPS Subpart OOOOa requires owners and operators to submit semiannual reports to the EPA via the Compliance and Emissions Data Reporting Interface (CEDRI) containing information required by 40 C.F.R. § 60.5422a(b) and (c) in addition to the information required by 40 C.F.R. § 60.487a(a), (b)(1) through (3) and (5), and (c)(2)(i) through (iv) and (vii) through (viii). 40 C.F.R. § 60.5422a(a).

517. On November 8, 2015, Defendant Mid-Continent initiated Phase 1 of the PSV project. On April 11, 2016, Defendant Mid-Continent initiated Phase 2 of the PSV project. Defendant Mid-Continent claims that the PSV project was complete on April 20, 2018.

518. Defendant Mid-Continent has not submitted an initial annual report.

519. Defendant Mid-Continent did not submit a semiannual report via CEDRI until July 30, 2018.

520. Therefore, Defendant Mid Continent has violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5420a, and 40 C.F.R. § 60.5422a(a).

521.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Mid-Continent to injunctive relief and civil penalties for each day that each violation continued.

**THIRTY-FIRST CLAIM FOR RELIEF**
**NSPS Subpart OOOO – Failure to Perform Initial Performance Test for Enclosed Combusters**
**(Harrison Hub)**

522.     Paragraphs 1 through 521 are realleged and incorporated by reference as if fully set forth within.

523.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendant was required to comply with the requirements of 40 C.F.R. § 60.482-10a with respect to closed vent systems and control devices used to comply with provisions of NSPS Subpart VVa, including pressure relief devices controlled under NSPS Subpart VVa at 40 C.F.R. § 60.482-4a(c).  40 C.F.R. § 60.5400(a) and 40 C.F.R. § 60.482-10a.

524.     NSPS Subpart VVa defines "closed vent system," in part, as a "system that transport[s] gas or vapor from a piece or pieces of equipment to a control device." 40 C.F.R. § 60.481a.

525.     NSPS Subpart VVa defines "control device" as "an enclosed combustion device, vapor recovery system, or flare." 40 C.F.R. § 60.481a.

526.     Pursuant to 40 C.F.R. § 60.482-10a(c), enclosed combustion devices shall be designed and operated to reduce the VOC emissions vented to them with an efficiency of 95 percent or greater, or to an exit concentration of 20 ppmv, on a dry basis, corrected to 3 percent oxygen, whichever is less stringent or to provide a minimum residence time of 0.75 seconds at a minimum temperature of 816 °C.

527.     NSPS Subpart VVa at 40 C.F.R. § 60.482–1a(a) requires an owner or operator to demonstrate compliance for each piece of equipment within 180 days of initial startup, and the NSPS General Provisions at 40 C.F.R. § 60.8 requires an initial performance test to be completed not later than 180 days after initial startup.

528.     The Harrison Hub Facility includes two enclosed combustors that are used in part to control emissions control emissions from pressure relief devices. The enclosed combustors are: The John Zink model (VIN 900-SK25.006) installed in December 1015, and the Jordan Technologies model (VIN JT-VCU-2600-1-1) installed in June 2013.

529.     During the September 2017 inspection, EPA requested documentation of the initial performance tests demonstrating compliance with the enclosed combustor standards.

530.     Defendant UEOM failed to provide documentation of an initial performance test demonstrating compliance with the enclosed combustor standards for the two enclosed combustor.

531.     By failing to conduct an initial performance test within 180 days of startup to demonstrate compliance for the performance test on the John Zink (VIN 900-SK25.006) enclosed combustor, Defendant UEOM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. §§ 60.8 and 60.482–1a(a).

532.     By failing to conduct an initial performance test within 180 days of startup to demonstrate compliance for the performance test on the Jordan Technologies model (VIN JT-VCU-2600-1-1) enclosed combustor, UEOM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. §§ 60.8 and 60.482-1a(a).

533.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant UEOM to injunctive relief and civil penalties for each day that each violation continued.

**THIRTY-SECOND CLAIM FOR RELIEF**
**NSPS Subpart OOOO – Failure to Cap or Seal Open-Ended Lines**
**(Harrison Hub)**

534.     Paragraphs 1 through 533 are realleged and incorporated by reference as if fully set forth within.

535.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendant was required to equip each open-ended valve or line with a cap, blind flange, plug, or a second valve to seal the open end at all times.   40 C.F.R. § 60.5400(a) and 40 C.F.R. § 60.482-6a(a).

536.     NSPS Subpart VVa defines "open-ended valve or line" as "any valve, except safety relief valves, having one side of the valve seat in contact with process fluid and one side open to the atmosphere, either directly or through open piping." 40 C.F.R. § 60.481a.

537.     During the September 2017 Inspection, EPA recorded infrared videos of emissions from the open ends of two hoses in Truck Loading Lane No.1. Neither was equipped with cap, plug, or second valve to seal the hose.

538.     By failing to equip each of hoses in Truck Loading Lane No 1 with cap, blind flange, plug or second valve to seal the open end at all times, UEOM violated 40 C.F.R. § 60.482-6a(a) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

539.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant UEOM to injunctive relief and civil penalties for each day that each violation continued.

### THIRTY-THIRD CLAIM FOR RELIEF
### NSPS Subpart OOOO – Failure to Perform Timely Repairs
### (Harrison Hub)

540.     Paragraphs 1 through 539 are realleged and incorporated by reference as if fully set forth within.

541.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendant UEOM was required to make a first attempt at repair of a leaking valve in gas/vapor or light liquid service within five calendar days of the date the leak was detected. 40 C.F.R. § 60.5400(a) and 40 C.F.R. § 60.482-7a(d)(2).

542.     For seven valves in gas or light liquid service, between May 5, 2017 and June 19, 2017, UEOM failed to make a first attempt at repair within 5 days, in violation of 40 C.F.R. § 60.482-7a(d), and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

543.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant UEOM to injunctive relief and civil penalties for each day that each violation continued.

### THIRTY-FOURTH CLAIM FOR RELIEF
### NSPS Subpart OOOO - Pressure Relief Devices – Detectable Emissions Greater than 500 ppm
### (Harrison Hub)

544.     Paragraphs 1 through 543 are realleged and incorporated by reference as if fully set forth within.

545.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendant UEOM was required to operate each pressure relief device in gas/vapor service with no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background. 40 C.F.R. § 60.5400(a) and 40 C.F.R. § 60.482-4a(a).

546.    Defendant UEOM's LDAR database designates certain pressure relief devices as in gas/vapor service and does not designate any exemption from standard.

547.    During the September 2017 Inspection, EPA detected and measured emissions greater than 500 ppm for 75 such pressure relief devices.

548.    By failing to operate each of these 75 pressure relief devices with detectable emissions less than 500 ppm, Defendant UEOM violated 40 C.F.R. § 60.482-4a(a) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

549.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant UEOM to injunctive relief and civil penalties for each day that each violation continued.

## THIRTY-FIFTH CLAIM FOR RELIEF
### NSPS Subpart Db - NOx CEMS and Initial Performance Test
(Harrison Hub)

550.    Paragraphs 1 through 549 are realleged and incorporated by reference as if fully set forth within.

551.    NSPS Subpart Db applies to each steam generating unit that commenced construction after June 19, 1984, that has a heat input capacity greater than 100 MMBtu/hr. 40 C.F.R. § 60.40b(a).

552.    The Hot Oil Heater at the facility fires natural gas, has a design capacity of 150MMBtu/hr, and was constructed after June 19, 1984.

553.    Pursuant to 40 C.F.R. § 60.44b(a)(1)(i), on and after the date on which the initial performance test is completed or required to be completed under 40 C.F.R. § 60.08, NOx emissions from the Hot Oil Heater shall not exceed 0.10 lb/MMBtu.

554.   Pursuant 40 C.F.R. § 60.08, the initial performance test for NOx was required to be completed not later than 180 days after initial startup of a subject steam generating unit.

555.   Pursuant to 40 C.F.R. § 60.48b(b)(1), as relevant, the owner or operator of each steam generating unit shall install, calibrate, maintain a continuous emissions monitoring system (CEMS) for measuring NOx emissions.

556.   By failing to conduct an initial performance test on the Hot Oil Process Heater for NOx, Defendant UEOM violated 40 C.F.R. § 60.08 and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

557.   By failing to install, calibrate, maintain, and operate a CEMS for measuring NOx emissions from the Hot Oil Process Heater, UEOM violated 40 C.F.R. § 60.48b(b)(1) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

558.   As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant UEOM to injunctive relief and civil penalties for each day that each violation continued.

### THIRTY-SIXTH CLAIM FOR RELIEF
### NSPS Subpart Kb – Failure to Prevent Leaks at Storage Tank A
### (Harrison Hub)

559.   Paragraphs 1 through 558 are realleged and incorporated by reference as if fully set forth within.

560.   Pursuant to Subpart NSPS OOOO at 40 C.F.R. § 60.5395(d), the standards for storage tanks identified under that section do not apply to storage tanks subject to and controlled in accordance with the requirements for storage tanks NSPS Subpart Kb.

561.   NSPS Subpart Kb (40 C.F.R. §§ 60.110b – 60.117b) applies, as relevant, to each storage tank with a capacity greater than or equal to 75 cubic meters ($m^3$) that is used to store

volatile organic liquids (VOL), for which construction is commenced after July 23, 1984. 40 C.F.R. § 60.110b(a).

562.     NPSP Subpart Kb at 40 C.F.R. § 60.112b(a) specifies the VOC standard for storage tanks with, as relevant, a design capacity greater than or equal to 151 m$^3$, containing a VOL that, as stored has a maximum true vapor pressure equal to or greater than 5.2 kPa but less than 76.6kPa.

563.     Storage Tank A has a design capacity greater than 151 m$^3$, was constructed after July 23, 1984, and is used to store gasoline, a VOL that, as stored, has a maximum true vapor pressure greater than or equal 5.2 kPa but less than 76.6 kPa.

564.     To comply with 40 C.F.R. § 60.112b(a), Storage Tank A is equipped with a fixed roof in combination with an internal floating roof, and, as such, is required to meet the specifications identified under 40 C.F.R. § 60.112b(a)(1).

565.     Pursuant 40 C.F.R. § 60.112b(a)(1)(ii) – which requires internal floating roof to have a closure device between the wall of the storage vessel and the edge of the internal floating roof – the internal floating roof of Storage Tank A is equipped with two seals.

566.     40 C.F.R. § 60.112(b)(a)(1)(ii)(B) requires each of the two seals to form a continuous closure around the circumference of the tank.

567.     Pursuant to 40 C.F.R. § 60.112b(a)(1)(vi), rim space vents shall be equipped with a gasket and are to be set to open only when the internal floating roof is not floating.

568.     During the September 2017 Inspection, EPA recorded infrared video of emissions leaking from the rim vents of Storage Tank A. At the time the internal roof was floating

569.     Defendant UEOM violated 40 C.F.R. § 60.112(b)(a)(1)(ii)(B) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e), by failing to equip the internal roof with two seals that form a continuous closure around the circumference of the tank, and/or UEOM violated 40 C.F.R. §

60.112b(a)(1)(vi) and Section 111(e) of the CAA, 42 U.S.C. § 7411(e), by setting the gasket to open when the internal roof was floating.

570.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant UEOM to injunctive relief and civil penalties for each day that each violation continued.

### THIRTY-SEVENTH CLAIM FOR RELIEF
### NSPS Subpart OOOO - Failure to Conduct Monthly Monitoring on Leaking Valves
### (Moundsville Facility)

571.     Paragraphs 1 through 570 are realleged and incorporated by reference as if fully set forth within.

572.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendant Williams OVM was required to monitor each valve in gas/vapor or light liquid service at which a leak had been detected on a monthly basis until a leak was not detected for two successive months. 40 C.F.R. §§ 60.5400(a) and 60.482-7a(c)(2).

573.     Following the detection of leaks at two valves in gas/vapor or light liquid service in the fractionation unit 1 process unit on or about May 9, 2013, Defendant Williams OVM failed to monitor those valves again until July 24, 2013, thereby failing comply with the requirement to conduct monthly monitoring until a leak was not detected for two successive months.

574.     Therefore, Defendant Williams OVM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. § 60.482-7a(c)(2)).

575.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Williams OVM to injunctive relief and civil penalties for each day that each violation continued.

## THIRTY-EIGHTH CLAIM FOR RELIEF
## NSPS Subpart OOOO - Failure to Conduct Timely Repairs
### (Moundsville Facility)

576.     Paragraphs 1 through 575 are realleged and incorporated by reference as if fully set forth within.

577.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Defendant Williams OVM was required to make a first attempt at repair of a leaking valve in gas/vapor or light liquid service within five calendar days of the date the leak was detected. 40 C.F.R. §§ 60.5400(a) and 60.482-7a(d)(2).

578.     Between at least September 2013 and June 2014, Defendant Williams OVM failed to make a first attempt at repair of numerous leaking valves in gas/vapor or light liquid service in the fractionation unit 1 and storage and loading process units within five calendar days of the date the leak was detected.

579.     Under NSPS Subpart OOOO's alternative requirements for pressure relief devices, owners and operators of affected facilities must repair a leaking pressure relief device in gas/vapor service as soon as practicable but no later than fifteen calendar days from the date the leak was detected. 40 C.F.R. § 60.5401(b)(3)(i).

580.     Following the detection of leaks at two pressure relief devices in gas/vapor service in the fractionation unit 1 process unit on April 11, 2013, Defendant Williams OVM failed to repair those leaking pressure relief devices until May 10, 2013, where no circumstances existed allowing a delay of repair under 40 C.F.R. § 60.482-9a.

581.     Therefore, Defendant Williams OVM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. §§ 60.482-7a(d)(2)) & 60.5401(b)(3)(i).

582.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Williams OVM to injunctive relief and civil penalties for each day that each violation continued.

## THIRTY-NINTH CLAIM FOR RELIEF
### NSPS Subpart OOOO - Failure to Identify & Monitor Connectors
### (Moundsville Facility)

583.     Paragraphs 1 through 582 are realleged and incorporated by reference as if fully set forth within.

584.     With certain exceptions and alternatives not relevant here, Defendant Williams OVM was required to identify connectors at its Moundsville Facility. 40 C.F.R. §§ 60.5400(a) and 60.842-11a(g).

585.     NSPS Subpart OOOO requires an owner or operator of an affected facility to monitor for leaks at connectors in gas/vapor or light liquid service within twelve months of startup. 40 C.F.R. § 60.482-11a(a). NSPS Subpart OOOO requires an owner or operator of an affected facility to subsequently remonitor connectors in gas/vapor or light liquid service at a rate based upon the percent of leaking connectors. 40 C.F.R. § 60.482-11a(b)(3). NSPS Subpart OOOO requires an owner or operator of an affected facility to keep a record of the start date and end date of each monitoring period for each process unit. 40 C.F.R. § 60.482-11a(b)(3)(v).

586.     Between November 2012 and approximately June 2015, Defendant Williams OVM failed to identify connectors in all process units at its Moundsville Facility.

587.     From the time Williams OVM commenced operation of the Moundsville Facility on November 22, 2012, to approximately January 2016, Williams OVM failed to conduct monitoring of the connectors in all process units at the Moundsville Facility.

588.     Therefore, Defendant Williams OVM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. § 60.482-11a).

589.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendant Williams OVM to injunctive relief and civil penalties for each day that each violation continued.

## FORTIETH CLAIM FOR RELIEF
### NSPS Subpart OOOO – Failure to Conduct Timely Monitoring
(Oak Grove Facility)

590.     Paragraphs 1 through 589 are realleged and incorporated by reference as if fully set forth within.

591.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, pumps subject to LDAR monitoring requirements must be monitored within 180 days of startup. 40 C.F.R. §§ 60.5400(a) and 60.482-1a(a). Thereafter, such pumps must be monitored on a monthly basis (subject to certain exceptions not relevant here). 40 C.F.R. §§ 60.5400(a) and 60.482-2a(a)(1).

592.     With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Williams OVM was required to monitor each valve in gas/vapor or light liquid service on a monthly basis. 40 C.F.R. §§ 60.5400(a) and 60.482-7(a)(1).

593.     Initial start-up of the Oak Grove Facility's debutanizer process units occurred on or about December 12, 2014, but Williams OVM failed to begin monitoring the pumps and valves in the debutanizer process units at the Oak Grove Facility until November 2015.

594.     Additionally, Williams OVM's Oak Grove Facility's pump #11113 in the stabilizer process unit was monitored on November 18, 2014 and then not monitored again until April 6, 2015.

95

595.    Therefore, Williams OVM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. §§ 60.482-1a, 60.482-2a(a)(1), and 60.482-7(a)(1)).

596.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Williams OVM to injunctive relief and civil penalties for each day that each violation continued.

**FORTY-FIRST CLAIM FOR RELIEF**
**NSPS Subpart OOOO - Failure to Identify & Monitor Connectors**
**(Oak Grove Facility)**

597.    Paragraphs 1 through 596 are realleged and incorporated by reference as if fully set forth within.

598.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Williams OVM was required to identify all connectors in gas/vapor or light liquid service at its Oak Grove Facility. 40 C.F.R. §§ 60.5400(a) and 60.842-11a(g).

599.    With certain exceptions and alternatives not relevant here, pursuant to NSPS Subpart OOOO, Williams OVM was required to monitor all connectors in gas/vapor or light liquid service in the process unit for leaks by the later of either twelve months after the compliance date or twelve months after the initial startup. 40 C.F.R. §§ 60.5400(a) 60.482-11a(a).

600.    Between May 29, 2014 and approximately July 2015, Williams OVM failed to identify all connectors in gas/vapor or light liquid service in all process units at its Oak Grove Facility.

601.    Williams OVM began to operate its equipment at the Oak Grove Facility on May 28-29, 2014, but Williams OVM first monitored the 4,880 connectors in its process units at its Oak Grove Facility no earlier than July 2015.

602.    Therefore, Williams OVM violated Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.5400(a) (and by reference 40 C.F.R. § 60.482-11a(g) and 40 C.F.R. § 60.482-11a(a)).

603.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Williams OVM to injunctive relief and civil penalties for each day that each violation continued.

**FORTY-SECOND CLAIM FOR RELIEF**
**NSPS Subpart NNN – Failure to Comply**
**(Conway, Paradis, Harrison Hub, Moundsville, and Opal Facilities)**

604.    Plaintiffs United States of America, Louisiana Department of Environmental Quality, and the State of West Virginia reallege and incorporate by reference paragraphs 1 through 603 as if fully set forth within.

605.    Defendants failed to demonstrate compliance with the provisions of NSPS Subpart NNN for its distillation operations and meet NSPS Subpart NNN's monitoring, recordkeeping, and reporting requirements at the Conway, Paradis, Harrison Hub, Moundsville, and Opal Facilities, in violation of NSPS Subpart NNN (40 C.F.R. §§ 60.662, 60.663, 60.665(a), and 60.665(b)), and Section 111(e) of the CAA.

606.    Defendants failed to comply with the emission control requirements of NSPS Subpart NNN with respect to uncontrolled vented emissions from the pilot designed pressure relief devices associated with subject distillation operations and reactor processes, in violation of NSPS Subpart NNN (40 C.F.R. § 60.662), and Section 111(e) of the CAA.

607.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, the violations set forth above subject Defendants to injunctive relief and civil penalties for each day that each violation continued.

## FORTY-THIRD CLAIM FOR RELIEF
### Louisiana Department of Environmental Quality

608.    Plaintiff Louisiana Department of Environmental Quality realleges and incorporates by reference Paragraphs 1 through 607 as if fully set forth within.

609.    Plaintiff Louisiana DEQ alleges on information and belief that Williams Companies, Williams Field Services Company LLC, and Discovery Producer Services LLC violated and/or continue to violate New Source Performance Standards incorporated by reference at LAC 33:III.Chapter 30, Subchapter A at the Larose Facility and Paradis Facility.

610.    Plaintiff Louisiana DEQ alleges on information and belief that Williams Companies, Williams Field Services Company LLC, Discovery Producer Services LLC 's violations of Louisiana Environmental Quality Act, La. R.S. 30:2057(A)(1) and (2) at the LaRose Facility and Paradis Facility also violated or continue to violate LDEQ's approved Title V Program under LAC 33:III.Chapter 5 and the rules promulgated pursuant to the Louisiana Environmental Quality Act.

611.    As provided in in the Louisiana Environmental Quality Act, specifically La. R.S. 30:2025, the violations set forth above subject Defendants Williams Companies, Inc., Williams Field Services Company LLC, and Discovery Producer Services LLC to injunctive relief and civil penalties for each day that each violation continued.

## FORTY-FOURTH CLAIM FOR RELIEF
### Wyoming

612.    Plaintiff Wyoming realleges and incorporates by reference Paragraphs 1 through 611 as if fully set forth within.

613.     Plaintiff Wyoming alleges on information and belief that Williams Companies and Williams Field Services Company, LLC violated and/or continue to violate NSPS Subparts VV, VVa, KKK, and OOOO at the Echo Springs Facility and Opal Facility.

614.     Plaintiff Wyoming alleges on information and belief that Williams Companies and Williams Field Services Company, LLC's violations of NSPS Subparts VV, KKK, and OOOO at the Echo Springs Facility and Opal Facility also violated or continue to violate the Wyoming Environmental Quality Act, Wyo. Stat. 35-11-101 et seq., and the rules promulgated pursuant thereto, including the Wyoming Air Quality Standards and Regulation, and the applicable conditions of its Title V Operating Permits, Permit Nos. P0021921 and P0027858.

The violations set forth above subject Defendants Williams Companies, Inc. and Williams Field Services Company, LLC to injunctive relief and civil penalties for each day that each violation continued.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the allegations contained in Paragraphs 1 through 0 above, Plaintiffs respectfully request this Court to enter judgment in favor of Plaintiffs and against Defendants, and:

A.     Permanently enjoin Defendants from further violating the Clean Air Act, regulations implementing the Act, and applicable state and tribal laws and regulations;

B.     Order Defendants to take appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Act, regulations implementing the Act, and applicable state and tribal laws and regulations;

C.     Assess a civil penalty against Defendants for each violation of the applicable provisions of the Act and the regulations implementing the Act, of up to $37,500 per day for

each violation occurring between January 13, 2009, and November 2, 2015, and up to $117,468

per day for each violation occurring on or after November 3, 2015; and

     D.     Award Plaintiffs its cost of this action; and,

     E.     Grant such other and further relief as the Court deems just and proper.

     Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Date: April 20, 2023

/s/ Thomas Kolkin
THOMAS P. KOLKIN
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
(202) 305-0427 (phone)
(202) 514-0097 (fax)
Thomas.Kolkin@usdoj.gov (Email)

OF COUNSEL

Timothy J. Sullivan
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, CO 80202-1129

**FOR THE SOUTHERN UTE INDIAN TRIBE:**

Date: April 20, 2023

/s/ David C. Smith
DAVID C. SMITH
*Director*
LORELYN HALL
*Deputy Director*
SOUTHERN UTE LEGAL DEPARTMENT
P.O. Box 737
Ignacio, CO 81137
(970) 563-2140
dasmith@southernute-nsn.gov

Sam W. Maynes
Maynes, Bradford, Shipps & Sheftel, LLP
835 East Second Ave., Suite 123
Durango, CO 81301
(970) 247-1755
smaynes@mbssllp.com

**FOR THE STATE OF ALABAMA AND THE ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT:**

STEVE MARSHALL
ATTORNEY GENERAL

Date: April 20, 2023

By: _/s/ Steven Shawn Sibley_
STEVEN SHAWN SIBLEY
Assistant Attorney General and General Counsel
Alabama Department of Environmental Management
1400 Coliseum Boulevard
Montgomery, Alabama 36110
(334) 271-7855 (phone)
(334) 260-4544 (fax)
ssibley@adem.alabama.gov

**FOR THE STATE OF COLORADO, ON BEHALF OF THE COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**


PHIL WEISER
Attorney General
State of Colorado


Date: April 20, 2023

/s/ David Beckstrom
DAVID BECKSTROM
Assistant Attorney General
Air Quality Unit
Natural Resources and Environment Section
Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
(303) 508-6306 (phone)
(303) 508-6039 (fax)
David.Beckstrom@coag.gov

**FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY:**

Date: April 20, 2023

/s/ Andrea' Z. Jones
ANDREA' Z. JONES, Trial Attorney
(La. Bar #25426)
Jill Clark (La Bar #33050), General Counsel
Jay Glorioso (La. Bar #28050), Attorney Supervisor
Office of the Secretary, Legal Affairs Division
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068
Andrea.Jones@la.gov
Jill.Clark@la.gov
Jay.Glorioso@la.gov

**FOR THE STATE OF WEST VIRIGINA:**

Date: April 20, 2023

/s/ Brooke A. Hirst
BROOKE A. HIRST
Attorney, Office of Legal Services
West Virginia Department of Environmental
Protection
601 57th Street, Southeast
Charleston, WV 25304

**FOR THE STATE OF WYOMING:**

Date: April 20, 2023

/s/ David DeWald

DAVID DeWALD

Deputy Attorney General

Office of the Wyoming Attorney General

2320 Capitol Avenue

Cheyenne, Wyoming 82002

david.dewald@wyo.gov